811 F.2d 881
 Eddie Lee GRAHAM, Plaintiff,
v.
MILKY WAY BARGE, INC., and Chevron U.S.A., Inc.,
Defendants-Appellees- Appellants,
v.
LAND AND OFFSHORE SERVICES, INC., et al, Defendants-Third
Party Plaintiffs- Appellees Cross-Appellants,
v.
AMERICAN FIDELITY INS. CO., Third Party Defendant-Appellant
Cross-Appellee, and Southern American Insurance
Co., Third Party Defendant-Appellee
Cross- Appellant.
 (District Court No. 80-3684 and related District Court Nos.
80-4016, 81-951 and 81-3616)
 No. 84-3695.
 United States Court of Appeals,
Fifth Circuit.
 March 9, 1987.
 
 David L. Carrigee, New Orleans, La., for Continental Underwriters, ltd.
 Ross Scaccia, New Orleans, La., for Charles Taylor.
 Robert S. Reich, New Orleans, La., for Chevron.
 Harvey J. Lewis, New Orleans, La., for Elizabeth Daniels.
 Clarence A. Frost, Mat M. Gray, III, New Orleans, La., for E.A. Hermitage.
 Randolph J. Waits, John F. Emmett, New Orleans, La., for American Fidelity Ins.
 Thomas Lewis, Thomas Loehn, New Orleans, La., for St. Paul Fire & Marine.
 Charles E. Lugenbuhl, Larzelere, Ellefson, Pulver, New Orleans, La., for North River Ins., Land & Offshore.
 Robert A. Vosbein, Lynn M. Luker, New Orleans, La., for Milky Way Barge and Bossier Bank.
 Terry Bell, Metairie, La., for Graham.
 Edward F. LeBreton, III, J. Barbee Winston, New Orleans, La., for Southern American Ins. Co.
 
 
 1
 Stanley L. Perry, Galliano, La., for Horace Herrin and Horace Herrin Agency.
 
 
 2
 Appeals From the United States District Court for the Eastern District of Louisiana.
 
 
 3
 Before GEE and WILLIAMS, Circuit Judges, and HINOJOSA,* District Judge
 
 HINOJOSA, District Judge:
 FACTS AND PROCEEDINGS BELOW
 
 4
 On September 5, 1980, the lift or "jack up" vessel, the M/V STAR II, (hereinafter STAR II), capsized off the coast of Louisiana in the Gulf of Mexico. Four men were thrown overboard as the vessel capsized. One, Barton Daniel, is missing and presumed drowned. Two others, Charles Taylor, (hereinafter Taylor), Eddie Lee Graham, (hereinafter Graham) and Captain Rodney Terrebone, (hereinafter Captain Terrebone) were injured but eventually rescued.
 
 
 5
 The STAR II was owned by Milky Way Barge Line, Inc., (hereinafter Milky Way), and time chartered to Chevron, U.S.A., Inc., (hereinafter Chevron) to service Chevron's equipment in the Gulf. Chevron also had a contract with Land and Offshore Services, Inc., (hereinafter LOS) to perform sandblasting and painting services on Chevron's offshore drilling platforms. The four men thrown overboard were employees of LOS.
 
 
 6
 In early September of 1980 the STAR II was jacked up next to Chevron's "CM" platform in the South Timbalier Block 24 of the Gulf, approximately 5 miles offshore and in approximately 54 feet of water. The STAR II had been jacked up next to the CM platform since the 3rd of September. The LOS maintenance crew, housed on the STAR II to service the CM platform, had not been able to do any work on the platform since the afternoon of the 3rd, due to increasingly severe weather conditions. By the 4th, the waves had increased to 4 to 6 feet and the wind was predicted to pick up as well. In the early hours of the 5th, Captain Terrebonne, the captain of the STAR II, was awakened by the sound of the waves striking the hull of the vessel.
 
 
 7
 Realizing that there was an insufficient air gap between the elevated hull and the surface of the water, Captain Terrebone then tried to jack up the vessel further in an attempt to maintain an air gap. One of the hydraulic jacks malfunctioned and Captain Terrebone was unable to raise the ship to safety. Captain Terrebone gave an order to abandon the ship and board the platform, but the ship capsized before Captain Terrebone, Barton Daniel, Graham or Taylor could reach the platform. The STAR II was a total loss. LOS lost equipment and supplies which had been stored on the STAR II. After the STAR II capsized, it floated downwind until it hit and damaged Chevron's adjacent South Timbalier 24 "CC" platform.
 
 
 8
 This appeal concerns review of four separate actions consolidated for trial together with various cross-claims, counterclaims and third party demands.
 
 
 9
 Graham, Taylor, and the surviving spouse of Barton Daniel, (hereinafter Daniel) instituted actions against Milky Way and Chevron. A fourth suit was brought by Milky Way and the Bossier Bank & Trust Company, (hereinafter Bossier Bank), which held a mortgage on the STAR II, against American Fidelity Insurance Company, (hereinafter American Fidelity) and Underwriters at Lloyds, (hereinafter Lloyds) seeking recovery for the loss of the vessel. In turn, Milky Way and Chevron responded to the injury and death claims with an Answer and third party demand against their protection and indemnity underwriters, American Fidelity and Southern American Insurance Company (hereinafter Southern American).
 
 
 10
 Milky Way also brought third party demands against its insurance agent, Horace Herrin, and against Continental Underwriters, Ltd., (hereinafter Continental), a surplus lines broker. Continental brought an action for indemnity against the St. Paul Fire & Marine Insurance Company, (hereinafter St. Paul), its errors and omissions carrier.
 
 INSURANCE COVERAGE
 
 11
 There were five policies upon which Milky Way, Bossier Bank, the preferred ship Mortgage holder on the STAR II, and Chevron relied to establish coverage of the loss. Bossier Bank is named as the loss payee in the policies issued by American Fidelity and certain underwriters at Lloyd's. American Fidelity was the primary underwriter for both the hull and Protection and Indemnity (P & I) policies. Southern American provided excess hull and P & I insurance, and Lloyd's wrote an increased value policy for the STAR II.
 
 
 12
 The district court found that the following limitations were explicit in the primary policies and incorporated by reference into the remaining policies: (a) the STAR II was to be operated in "the inland waters of the Gulf states"; (b) the vessel would be limited to 40 feet of water "for elevating purposes"; and (c) the vessel would neither elevate in seas of 5' or more, nor remain elevated, when the seas increased to 5 feet and were predicted to rise.[1] The holders of the primary and excess coverage policies, American Fidelity, Southern American and Lloyd's denied coverage, asserting breaches of the limits in the policies.
 
 
 13
 Milky Way, the owner of the STAR II, purchased the insurance policies through the Horace Herrin Insurance Agency. Horace Herrin (hereinafter Herrin) of the Horace Herrin Agency acted through Continental, an insurance agency and brokerage firm. When Sidney Duet, (hereinafter Duet), acting for Milky Way Barge, contacted Herrin to obtain the initial coverage for the STAR II, Herrin contacted Elder Brown at Continental who bound coverage in a matter of days.
 
 
 14
 In the summer of 1980, after the original insurance policies were bound, Milky Way extended the legs on which the STAR II jacks from their previous 60 feet to 90 feet, in order to work in deeper water. Duet discussed with Herrin the possibility of altering the STAR II, and its effect on the insurance coverage before the work was begun. However, Duet requested additional coverage to extend the navigational and operational limits on the STAR II only after the legs were extended. Herrin again immediately contacted Continental and Continental dispatched a marine surveyor to look at the alterations to the vessel. The surveyor recommended that a naval architect assess the STAR II. Continental did inform Herrin that a naval architect should be called in, but neither Herrin nor Continental engaged one.
 
 
 15
 Continental never procured a naval architect or the additional coverage. Herrin's telephone calls to Elder Brown, Jr. concerning the additional coverage were never returned. Consequently, Herrin and Milky Way were never aware that the additional coverage had not been secured until after the accident on September 5, 1980.
 
 
 16
 When American Fidelity, Southern American and Lloyd's denied coverage based upon a breach of the limitations, Milky Way and Bossier Bank also sought to recover against Herrin and Continental for failing to secure the additional coverage. Continental sought indemnity and a defense from its errors and omissions insurer St. Paul some two and one-half years after the incident. St. Paul denied coverage claiming untimely notice.
 
 
 17
 The district court used an advisory jury to assist on various issues, including the insurance question, throughout the trial. The jury heard testimony concerning the effect of the operational limits in the policies, the likely causes of the accident and that of insurance experts concerning the language in the policies. The jury answered in the affirmative a general question concerning insurance coverage under the existing policies.
 
 
 18
 In the district court's analysis, the limitations were either warranties, the breach of which would automatically void coverage, or special conditions, limitations that require a causal connection between the breach of the policy and the accident in question to avoid coverage. Although the jury's verdict made no distinction between a warranty and a condition in an insurance policy, the district court found that the limitations imposed in the policies were not warranties.
 
 
 19
 The district court went on to find in its Findings of Fact and Conclusions of Law that "[t]he limitations contained in the policies were not express warranties and, therefore, coverage existed at the time of the casualty." The district court cited no authority for its distinction between a warranty and a special condition. 590 F.Supp. 721.
 
 
 20
 Appellants American Fidelity, Southern American, and Lloyd's challenge the warranty/special condition distinction relied upon by the district court. Appellee's Milky Way, Bossier Bank, and Chevron assert that the district court's ruling was correct as a matter of law, and cite the Louisiana anti-technical statute, La.R.S. Sec. 22:692, and cases interpreting that statute, for support.
 
 
 21
 The parties agree, and it is well settled law, that the law of the state in which the contract was formed, in the absence of federal admiralty rule, determines the rights of the parties. Wilburn Boat Co. v. Fireman's Fund Insurance Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), reh'g denied, 349 U.S. 907, 75 S.Ct. 575, 99 L.Ed. 1243. The parties are in apparent agreement that the question of insurance coverage should be decided under Louisiana law, where the insurance policies were formed.
 
 
 22
 In Louisiana, an insurance policy is a contract under the law and the rules established for the interpretation of agreements apply. Albritton v. Fireman's Fund Ins. Co., 224 La. 522, 70 So.2d 111, 113 (1954). Absent latent or patent ambiguities, the meaning of a contract is a matter of law for the court to decide. Kemp v. Hudnall, 423 So.2d 1260, 1261 (La.Ct.App.1982), writ denied, 428 So.2d 474 (1983).
 
 
 23
 Although the district court made no express finding of ambiguity, it treated the question of whether the limitations in the policies were warranties or conditions as a factual one. The distinction, if any, between a warranty and a condition must, however, be treated as a question of law.
 
 
 24
 The district court's distinction between a warranty and a condition apparently comes solely from the testimony of one expert witness testifying concerning insurance policies. Milky Way contends that the Louisiana anti-technical statute, La.R.S. Sec. 22:692, precludes a favorable ruling for the insurers as a matter of law. The statute upon which so much weight is placed reads, in part:
 
 
 25
 Sec. 692. Breach of warranties and conditions of fire policies and applications therefor
 
 
 26
 No policy of fire insurance issued by any insurer on property in this state shall hereafter be declared void by the insurer for the breach of any representation, warranty or condition contained in the said policy or in the application therefor. Such breach shall not avail the insurer to avoid liability unless such breach (1) shall exist at the time of the loss, and be either such a breach as would increase either the moral or physical hazard under the policy, or (2) shall be such a breach as would be a violation of a warranty or condition requiring the insurer to take and keep inventories and books showing a record of his business....
 
 
 27
 La.R.S. Sec. 22:692 (1978). Based upon the language of the statute itself, the provision would appear to apply to fire policies only.
 
 
 28
 This Court is aware that the learned courts of the state of Louisiana have not been loathe to extend the application of this statute, and La.R.S. Sec. 22:619, concerning warranties and misrepresentations in negotiation, beyond their apparent limits. However, the cases which Appellees cite for support of the extension of Sec. 22:692 beyond all recognizable limits do not support their contentions. To this date the Supreme Court of the State of Louisiana has not so extended the anti-technical statutes as to apply to the instant situation. In the absence of the state court precedent, this Court will decline to tread where the Louisiana Supreme Court has yet to go.
 
 
 29
 Appellees rely on the cases of Rodriguez v. Northwestern National Insurance Company, 358 So.2d 1237 (La.1978) and Benton Casing Service, Inc. v. Avemco Insurance Co., 379 So.2d 225 (La.1979) in support of the district court's findings. Although these cases do extend the scope of Louisiana's anti-technical statutes, they are inapposite to this case. In Rodriguez, supra, at 1241 the court found only that:
 
 
 30
 La.R.S. Sec. 22:692 does not apply exclusively to contracts which insure solely against loss through fire. It applies as well to warranty conditions upon fire insurance coverage included in contracts of insurance which cover a variety of risks. This Court has previously applied the statute to a policy covering accident and theft in addition to fire losses. [citing Lee v. Travelers Fire Ins. Company, 219 La. 587, 53 So.2d 692 (1951) ].
 
 
 31
 The loss involved in Rodriguez was, in fact, the destruction of a log skidder by fire. The court found only that La.R.S. Sec. 22:692 applies not only to policies providing coverage exclusively for fire damage, but also policies covering fire and property damage.
 
 
 32
 The case cited in Rodriguez, Lee v. Travelers Ins. Co., supra, also involves a fire loss and an insurance policy that covered that loss. In fact, this Court has not been able to find any Louisiana case law to the effect that La.R.S. Sec. 22:692 should be applied to any other than fire losses covered by a policy for insurance covering losses due to fire.[2] The losses which form the basis of this suit cannot be construed as losses due to fire, and the insurance policies in question are not fire insurance policies.
 
 
 33
 Appellees also place reliance upon the decision of the Louisiana Supreme Court in Benton Casing Service, Inc. v. Avemco Insurance Co., 379 So.2d 225 (La.1979), for support of the district court's decision. Benton Casing discusses the application of La.R.S. Sec. 22:619(A), which statute reads, in part:
 
 
 34
 Sec. 619. Warranties and misrepresentations in negotiation applications
 
 
 35
 A. Except as provided in Subsection B of this Section [concerning representations made in applications for life, death or accident insurance] and R.S. Sec. 22:692, [supra ] and R.S. Sec. 22:692.1 [entitled "Defense of material misrepresentation not entitlement to void policy" ], no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or void the contract or prevent it attaching unless the misrepresentation or warranty is made with the intent to deceive.
 
 
 36
 The decision in Benton Casing characterized as representations, statements made in an insurance policy to the effect that only when named pilots, licensed by the Federal Aviation Administration, were operating the insured's airplanes would those airlines be covered in the event of a loss or damage to any airplane. The pilot involved in the crash for which the insured sought coverage had all the qualifications listed in the policy but was not actually named in that policy. The court found that the list naming individual pilots constituted a representation, covered by La.R.S. Sec. 22:619(A) which would not defeat coverage unless made with the intent to deceive.
 
 
 37
 It is not apparent to this Court how Appellees contend this case applies to the policies at issue here. The navigational and operational limits contained in the policies issued by American Fidelity, Southern American and Lloyd's cannot be treated as representations made by the insured for purposes of La.R.S. Sec. 22:619(A). There is no evidence in the record to indicate that the limitations included in the policies were simply representations made in the course of negotiations.
 
 
 38
 It would appear to the Court that the navigational and operational limits included in the policies in question were fundamental to the ability of the parties to those policies to assess the risks against which the STAR II was to be insured and should be considered as an exclusion rather than a representation. It is apparent from the record that Milky Way and its representative for financial matters, Duet, were aware of the exclusive nature of the limitations, as shown by their attempts to obtain additional coverage for extended operational capacity.
 
 
 39
 This Court has once before analyzed the rationale behind Benton Casing and found three factors prominent in the Louisiana Supreme Court's holding. In Compass Insurance Co. v. Vanguard Insurance Company, 649 F.2d 331 (5th Cir., 1981), the court, at page 335, explained the following factors present in Benton Casing:
 
 
 40
 1. where the provision appeared in the policy;
 
 
 41
 2. whether the endorsement, if read as an exclusion, would render the policy ambiguous;
 
 
 42
 3. the past practice of the parties to the policy.
 
 
 43
 As in Compass, those three factors counsel treating the endorsement in the STAR II's policies as exclusions. The navigational limits included in the policies appeared in a section clearly marked "Endorsement No. ___.... In consideration of the premium charged the following conditions apply to the M/V "LA977GC" [the STAR II]: SPECIAL CONDITIONS...." There is no danger of any ambiguity should the endorsements be treated as exclusions as there is no language elsewhere in the policies to indicate broader or more restricted navigational and operational limits. Finally, there is no evidence in the record to indicate that there had been regular violations of the exclusions, with the knowledge of the insurers, to suggest any sort of waiver of those exclusions, as there had been in Benton Casing.
 
 
 44
 While Appellees rely on Benton Casing for support of the district court's use of a warranty/special condition distinction, this Court cannot help but find compelling the more general language included in that case at p. 232 as follows.
 
 
 45
 Briefly stated, the law is to the effect that the insurer is required to clearly express exclusions to its insuring obligations and that any doubt or ambiguity is to be resolved against the insurer, against forfeiture, and in favor of what reason and probability dictate was intended by the parties with respect to coverage.
 
 
 46
 It is evident from the record that Milky Way and its representative, considered the Endorsements to be exclusions. Duet contacted Milky Way's insurance agent both before and after the "legs" on the STAR II were extended, in an effort to have the navigational and operational limitations in the policies broadened to allow the STAR II to accept work in deeper waters. This Court can find nothing in the record to suggest that exclusions from coverage were anything other than "what reason and probability dictate was intended by the parties with respect to coverage." Appellees have been tempted by The Sirens' song of La.R.S. Secs. 22:619(A) and 692, but unlike Odysseus, have not been able to avoid the rocks. Appellees trust in those Sirens is, like that of the mythical mariners, tragically misplaced.
 
 
 47
 Absent statutory guidance, this Court must look to the development of case law for an answer. Generally, "insurance coverage is suspended when a vessel goes beyond the navigational limits and ... a loss during that time is not covered." United States Fire Ins. Co. v. Cavanaugh, 732 F.2d 832, 834 (11th Cir.1984) cert. denied, 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (citations omitted). Furthermore, this Circuit has long held that:
 
 
 48
 [a] warranty as to the place where the policy stipulates the insured vessel is to be located during the period covered by the policy makes the right of the insured to recover for damages or loss dependent upon the vessel being at the stated place when the damage or loss occurred; and if damage or loss occurs when the vessel is at a place other than the one named in the policy, the insured has no right to recover on the policy, though that place is quite as safe as the one named in the policy.
 
 
 49
 Robinson v. Home Insurance Co., 73 F.2d 3, 4 (5th Cir.1934) (citations omitted). The courts of the State of Louisiana hold to this strict application of policy exclusions, in the absence of statutory provisions. Lee v. Travelers Fire Ins. Co., 219 La. 587, 53 So.2d 692 (La.1951). R & W Boat Rentals, Inc. v. Pennsylvania Ins. Co., 257 So.2d 448 (La.App.1972).
 
 
 50
 The district court expressly found that the STAR II was operating in 54 feet of water, approximately 5 miles off-shore. It further found that the seas were, according to the weather report, 4 to 6 feet and predicted to rise. The district court declined to make any finding with respect to whether or not the STAR II was being operated in "inland waters."
 
 
 51
 However, it is clear, from the record, and none of the Appellants have challenged these findings, that the STAR II was operating beyond the express operational limits of 40 feet of water "for elevating purposes" and that it was elevated in seas that were above, and were predicted to rise beyond, 5 feet. Whether those breaches of the express exclusions increased the likelihood of the accident that actually occurred is irrelevant. The STAR II was operating beyond the navigational and operational limits imposed on it by its insurance policies and was thus not covered by those policies at the time of the accident.
 
 
 52
 As previously stated Milky Way also joined Herrin, the Horace Herrin Insurance Agency, and Continental as Third-Party Defendants. Milky Way claimed that in the event that the primary and excess policies did not cover the loss, it was because Herrin and Continental had negligently failed to obtain the additional coverage previously requested by Milky Way. The district court found that these claims were moot in light of its finding of coverage under the existing policies.
 
 
 53
 Milky Way's third-party claims, however, are no longer moot. This Court declines the request, made by Continental, to rule on those third-party claims of Milky Way which the trial court termed moot. Such a question is more properly remanded for determination by the district court.
 
 
 54
 Milky Way, Chevron, and Lloyd's appeal also the district court's rulings with respect to the insurers' duty to defend and for liability for attorney's fees and costs. Milky Way appeals the district court's denial of attorney's fees, costs and expenses of litigation in connection with Milky Way's claim for insurance coverage. In Louisiana,
 
 
 55
 An insurer is not precluded from seeking a judicial determination of its contractual liability, Coltar v. Gulf Ins. Co., 318 So.2d 923 (La.App. 4th Cir.1975), but it must bear the expenses of that determination and shoulder the risk of penalties and attorney's fees should its interpretation of the policy prove erroneous. Carney v. American Fire and Indem. Co., 371 So.2d 815 (La.1979).
 
 
 56
 Boudreaux v. Fireman's Fund Ins. Co., 654 F.2d 447, 451 (5th Cir.1981). "An insurer's liability to pay penalties and attorney's fees is based on whether their action in denying coverage is arbitrary, capricious and [sic] without probable cause." Carney, supra at 819 (citing La.R.S. Sec. 22:658[3]).
 
 
 57
 Whether an insurer acted in a manner that was arbitrary, capricious or without probable cause is a question of fact, Offshore Logistics v. Arkwright-Boston Mfrs., 639 F.2d 1142 (5th Cir.1981) reh'g denied, 647 F.2d 1121 citing, Reliance Insurance Co. v. Orleans Parish School Bd., 322 F.2d 803 (5th Cir.1963); Cryer v. Gulf Insurance Co., 276 So.2d 889 (La.App.1973), and should not be reversed unless clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure; McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954).
 
 
 58
 Although Milky Way prevailed on the insurance question at the district court level, it does not necessarily follow that the insurers' actions in denying coverage were arbitrary, capricious or without probable cause. A finding in favor of coverage but against fees and costs are not always inconsistent. DiPascal v. New York Life Ins. Co., 749 F.2d 255 (5th Cir.1985); Boudreaux, supra; Rudloff v. Louisiana Health Services Indem. Corp., 385 So.2d 767 (La.1979) (on rehearing). In the instant case, the district court found that American Fidelity and Southern American did not act unreasonably, nor in any way arbitrarily, capriciously or without probable cause in denying coverage under the primary and excess coverage policies.
 
 
 59
 American Fidelity and Southern American had ample cause to deny coverage, relying upon the express exclusions contained in the policies. In light of our decision with respect to the issue of insurance coverage, this Court cannot be heard to say that the district court's finding was clearly erroneous. Even without benefit of hindsight, the district court was correct in finding that Milky Way was not entitled to attorney's fees or costs pursuant to La.R.S. Sec. 22:658 (1986).
 
 
 60
 Lloyd's and Chevron appeal the district court's findings with respect to the insurers' duty to defend the various claims constituting the lawsuit. Lloyd's appeals a purported ruling to the effect that Lloyd's owed a defense to Milky Way for the personal injury and death claims against Milky Way. The Court can find nothing in the record to indicate that the district court entered any judgment to that effect.
 
 
 61
 Chevron appeals the dismissal of its claims for a defense from LOS' employment compensation insurers, United States Fire Insurance Company, North River Insurance Company and International Surplus Line Insurance Companies (hereinafter "compensation insurers") in policies which named Chevron as an alternate employee. Chevron made a third-party demand of the compensation insurers for a defense against Taylor's personal injury claims. Taylor asserted both a Jones Act claim pursuant to 46 U.S.C. Sec. 688, and under general maritime law.
 
 
 62
 The compensation insurer's duty to defend is not contingent upon the success of the claim against the party seeking a defense. Chevron bases its claim for a right to a defense on the following provision in LOS' policies with their compensation insurers:
 
 
 63
 It is agreed that the company [compensation insurers] will pay on behalf of or reimburse any corporation or organization named below [Chevron] (herein called the Alternate Employer) all compensation and other benefits required under the workmen's compensation law designated in the policy ... that the Alternate Employer is legally obligated to pay because of bodily injury by accident or disease including death at any time resulting therefrom, sustained by any employee of the insured [Land and Offshore Services] arising out of or in the course of work performed by the insured for the Alternate Employer.
 
 
 64
 On the face of this endorsement it does not appear that Chevron is entitled to any more than compensation in the event that Chevron is found to be obligated to pay to any employee of LOS.
 
 
 65
 Whether or not Chevron was entitled to a defense under LOS' employee's compensation policies is a question of fact which we will not overturn unless we find such a holding to be clearly erroneous.
 
 
 66
 An insurer's duty to defend an action against the insured is measured, in the first instance, by the allegations in the plaintiff's pleadings, and if such pleadings state facts bringing the injury within the coverage of the policy, the insurer must defend, irrespective of the insured's ultimate liability to the plaintiff.
 
 
 67
 Farrell Lines v. Insurance Co. of North America, 789 F.2d 300, 304 (5th Cir.1986) (citing Battiste v. Continental Casualty Co., 406 F.2d 1318, 1321 (5th Cir.1969)); Ezell v. Hayes Oilfield Const. Co., Inc., 693 F.2d 489 (5th Cir.1982) cert. denied, 464 U.S. 818, 104 S.Ct. 79, 78 L.Ed.2d 90 (1983); American Home Assurance Company v. Czarniecki, 255 La. 251, 230 So.2d 253 (La.1969). However, "... an indemnification agreement will not be interpreted to cover the negligence of the indemnitee unless the intent of the parties to provide that indemnification is clear and express." Knapp v. Chevron U.S.A., Inc., 781 F.2d 1123, 1127-1128 (5th Cir.1986).
 
 
 68
 Taylor's original pleading asserted only that he was an employee of LOS and that
 
 
 69
 he was caused injury by the negligence of defendants, Land & Offshore Services Incorporated, Chevron Corporation, Milky Way Barge Line Corporation, ABC(1) Company, and ABC(2) Company, their gear, appurtenances and tow.
 
 
 70
 Taylor did not recover on his Jones Act claim as a result of the jury's determination that Taylor was not a seaman for purposes of the Jones Act. Taylor's Jones Act claim was his only claim which was dependent upon an employee-employer relationship for recovery.
 
 
 71
 The "clear and express" language of the indemnification provision in the policies issued by the compensation insurers names Chevron only as an "alternate employer." Under the policies, as was the case in Knapp, supra, the provision makes no provision for any alleged independent negligence of Chevron. There is no indication in the Complaint that Taylor's claim was against Chevron as his employer, but rather, one for separate and independent negligence. Under the standard as we must apply it, we cannot say that the district court was clearly erroneous in disallowing Chevron's claim for a defense against the compensation insurers.
 
 
 72
 Both Southern American and American Fidelity assert that the district court erred in permitting the testimony of an expert witness for Milky Way, on the insurance question, in violation of the court's own scheduling order. Because we reverse the district court on the insurance coverage question, we need not address this question raised by Southern American and American Fidelity.
 
 DOHSA AND GENERAL MARITIME LAW CLAIMS
 
 73
 Appellant Daniel asserts as error two rulings of the district court with respect to her right to recover under state and general maritime law claims. First, Daniel assigns as error the district court's failure to apply the Louisiana wrongful death statute, La.Civ.Code art. 2315 (1986), which allows recovery of nonpecuniary losses. The district court held that the Death on the High Seas Act, (hereinafter "DOHSA"), 46 U.S.C. Sec. 761, et seq., which allows recovery of pecuniary losses only, provided Daniel with her sole claim for wrongful death. Daniel contends that DOHSA was not intended as the exclusive remedy for deaths at sea but that state law remedies should apply to supplement those remedies available under DOHSA.
 
 
 74
 Specifically, Daniel relies on this court's recent opinion in Tallentire v. Offshore Logistics, Inc., 754 F.2d 1274 (5th Cir.1985) which held that DOHSA does not provide the exclusive remedy for death on the high seas. However, this court's opinion in Tallentire has been reversed sub nom. Offshore Logistics, Inc. v. Tallentire, --- U.S. ----, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) directly holding that DOHSA does provide the exclusive remedy for wrongful death occurring on the high seas. The Supreme Court analyzed the legislative history of Sec. 7 of DOHSA, 46 U.S.C. Sec. 767, which reads:
 
 
 75
 The provisions of any State Statute giving or regulating rights of action or remedies for death shall not be affected by this chapter. Nor shall this chapter apply to the Great Lakes or to any waters within the territorial limits of any State, or to any navigable waters in the Panama Canal Zone.
 
 
 76
 The plaintiffs in Tallentire based their argument for the preservation of state wrongful death actions on this section of DOHSA.
 
 
 77
 The Supreme Court found that Congress' intent with respect to this section was merely to preserve the concurrent jurisdiction of state and federal courts to entertain wrongful death actions arising from accidents on territorial waters. Offshore Logistics, 106 S.Ct. at 2495. The Court discussed the goal of Congress to establish uniformity in maritime law and found:
 
 
 78
 In sum, we believe that our reading of Sec. 7, while not free from doubt, gives the proper meaning to the language of that section is supported by its legislative history, and is consistent with the law governing at the time of its passage. It is also in accord with the general congressional purpose behind the enactment of DOHSA.... To read Sec. 7 as intended to preserve intact largely non-existent or ineffective state law remedies for wrongful death on the high seas would, of course, be incongruous. Just as incongruous is the idea that a Congress seeking uniformity in maritime law would intend to allow widely divergent state law wrongful death statutes to be applied on the high seas. [citations omitted]. Indeed, it is hardly conceivable that Congress could have intended that these diverse state statutes could be applied to remedy maritime torts occurring the world over.
 
 
 79
 Offshore Logistics, 106 S.Ct. at 2499.
 
 
 80
 In light of the Supreme Court's clear mandate in Offshore Logistics, we must uphold the district court's denial of Daniel's state law based claims for non-pecuniary losses resulting from the wrongful death of Barton Daniel.
 
 
 81
 Daniel also challenges the district court's denial of any recovery for a survival action under general maritime law. Although Offshore Logistics, supra, clearly held that state wrongful death actions cannot be used to supplement an action under DOHSA, survival actions were not discussed. This Circuit has held:
 
 
 82
 Since DOHSA is a wrongful death statute which, whether through inadvertance or design, does not address survival of action, it is entirely appropriate that the courts should fill what would otherwise be a legislative void by allowing general maritime law survival action based on Moragne[4] to supplement DOHSA.
 
 
 83
 Azzopardi v. Ocean Drilling & Exploration Co., 742 F.2d 890, 894 (5th Cir.1984) (citations omitted); see Casaceli v. Martech International, Inc., 774 F.2d 1322 (5th Cir.1985) cert. denied, --- U.S. ----, 106 S.Ct. 1516, 89 L.Ed.2d 914. Based upon the law in this Circuit, it was error for the district court to deny Daniel's survival action.
 
 CHEVRON'S NEGLIGENCE
 
 84
 Chevron appeals the district court's finding of negligence on Chevron's part. The district court held in its Findings of Fact and Conclusions of Law as follows:
 
 
 85
 I conclude that a contributing cause of the casualty was Chevron's negligence in dispatching The STAR II to perform work in unsheltered open reaches of the Gulf without taking such reasonable precautions as would have kept that vessel informed of critical weather information (previously made available to Chevron by professional weather services). Such information--and a consideration thereof--was vital to a decision regarding the possible need to jack down and move into protected areas.... Having dispatched STAR II into unsheltered waters, this subsequent inaction [failing to broadcast the forecast of dangerous weather conditions] by Chevron deprived the vessel of weather information which, I conclude, affected the decision to jack down and move to sheltered waters--or not--at a time when such could have been safely accomplished.
 
 
 86
 I also conclude that Chevron's operations in the Gulf of Mexico having to do with the dispatching, operating and recalling of lift type vessels such as and including STAR II were of a type that caused certain obligations and duties therefrom.... taking into account the circumstances surrounding this incident including the unusual nature of these vessels, the area of operations, and the extent of control which Chevron retained over these operations in the Gulf, I find that an ongoing, reciprocal duty to meaningfully participate in critical recall decisions existed in tension with the dispatching decisions.
 
 
 87
 The district court further found that Chevron's negligence was 30% responsible for the injuries and losses sustained.
 
 
 88
 Chevron's chief argument is that as a time charterer it has no liability for the unseaworthiness of the chartered vessel or the negligence of its crew. Chevron cites many cases, both in this Circuit and others, where the time charterer was not held liable for the unseaworthiness of a chartered vessel or the negligence of its crew. Chevron's argument, however legally sound it may be, is inapposite to the findings by the district court. The district court found not that Chevron was responsible for any unseaworthiness of the vessel or negligence on the part of the crew but that Chevron's negligence was independent of any arising from the maintenance or operation of the STAR II.
 
 
 89
 The principal case upon which Chevron relies, M.O.N.T. Boat Rental Services, Inc. v. Union Oil Company of California, 613 F.2d 576 (5th Cir.1980), itself implicitly recognizes that there is a distinction between a time charterer's potential liability under the time charter and independent tort liability which is not governed by the time charter. In addition, general principles of negligence govern maritime torts. Casaceli v. Martech International, Inc., supra; Daigle v. Point Landing, Inc., 616 F.2d 825 (5th Cir.1980).
 
 
 90
 In reviewing the district court's determination of negligence in an admiralty action, this court must not set aside the findings of fact unless they are clearly erroneous. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Trautman v. Buck Steber, Inc., 693 F.2d 440 (5th Cir.1982). Mere disagreement with the district court's analysis of the record is insufficient, and we will not reverse unless "although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948), reh'g denied 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147; Verrett v. McDonough Marine Service, 705 F.2d 1437 (5th Cir.1983).
 
 
 91
 Measured by this standard, we must hold that the district court's determination that Chevron was negligent is not clearly erroneous. The district court gave extensive treatment to the special facts surrounding Chevron's responsibility for the transmission of weather updates, dispatching the STAR II into unsheltered waters, and due consideration for the precarious nature of lift barge operations. Although it may be unusual for a time charterer to be held liable for an incident concerning the vessel under charter, in this instance we cannot say that the district court erred in finding that Chevron's independent negligence contributed 30% to the capsizing of the STAR II.
 
 
 92
 Both Chevron and Daniel appeal the district court's apportionment of negligence. Chevron is alone in challenging the district court's adoption of the advisory jury's assessment of damages with respect to Taylor. Neither apportionments of negligence nor assessments of damages shall be overturned unless clearly erroneous. Verrett v. McDonough Marine Services, supra.
 
 
 93
 This Court should be wary of attempting to second guess the district court, which has the decided advantage of firsthand experience concerning the testimony and evidence presented at trial. The district court's careful treatment of all the evidence in the Findings of Fact and Conclusions of Law convinces us that there is no error with respect to these findings.
 
 
 94
 Chevron also challenges the district court's adoption of the advisory jury's recommendation of $176,500.00 for Taylor for claims under general maritime law. The district court adopted this award, although finding that "[t]his finding by the advisory jury seems to me to be very much on the high side but not so high as to be unacceptable." Upon reviewing the record we are not convinced that an error has been committed.
 
 SEAMAN STATUS
 
 95
 Appellant Taylor filed suit under both the Jones Act, 46 U.S.C. Sec. 688, and general maritime law. The district court empaneled a jury to decide the question of Taylor's status as a seaman for purposes of the Jones Act. Taylor was entitled to a jury determination of his seaman status pursuant to 46 U.S.C. Sec. 688 (1986). The jury determined that Taylor was not a seaman for purposes of the Jones Act at the time of the accident.
 
 
 96
 Taylor claims not only that the district court's instructions to the jury were incorrect as a matter of law, but also that the court erred in not finding that he is a seaman as a matter of law. Taylor was an employee of LOS as a part of the sandblasting and painting crew assigned to work on Chevron's "CM" platform. It is undisputed that the painting crew was housed on the STAR II but there is no evidence to indicate that the sandblasting and painting crew had any responsibilities with respect to the operation or maintenance of the STAR II.
 
 
 97
 "The determination whether a claimant has proved a sufficient connection with water-borne or vessel-related activities to invoke jurisdiction as a seaman under the Jones Act is a mixed question of law and fact." Holland v. Allied Structural Steel Co., Inc., 539 F.2d 476, 479 (5th Cir.1976), reh'g denied, 542 F.2d 1173, cert. denied, 429 U.S. 1105, 51 L.Ed.2d 557 (1977); Offshore Company v. Robison, 266 F.2d 769 (5th Cir.1959). Because the question of seaman status is a mixed question, it is rare that the answer will be so clear as to be subject to summary judgment or a directed verdict, although it is possible that the question may be one which need not go to a jury. See Bouvier v. Krenz, 702 F.2d 89 (5th Cir.1983).
 
 
 98
 This Circuit has addressed the standards for proof of seaman status many times. A worker claiming seaman status must show:
 
 
 99
 (1) That he is assigned permanently to, or performs a substantial part of his work on, (2) a vessel in navigation and (3) that the capacity in which he is employed, or the duty which he performs, contributes to the function of the vessel or the accomplishment of its mission.
 
 
 100
 Smith v. Odom Offshore Surveys, Inc., 791 F.2d 411, 415 (5th Cir.1986) (citing Barrett v. Chevron, U.S.A., Inc., 781 F.2d 1067 (5th Cir.1986) (en banc); Offshore Company v. Robison, 266 F.2d 769 (5th Cir.1959); McKie v. Diamond Marine Co., 204 F.2d 132 (5th Cir.1953)). Based upon this test, we cannot say that it was error for the district court to permit this issue to go to the jury. In fact, on similar facts this circuit has found a painter's helper not to be a seaman as a matter of law. Callahan v. Fluor Ocean Services, Inc., 482 F.2d 1350 (5th Cir.1973).
 
 
 101
 Taylor also cites as error the district court's instructions to the jury concerning his seaman status. The district court instructed the jury that, in order to prove seaman status, the plaintiff must meet three tests:
 
 
 102
 (1) he must show that he was doing work on or in connection with a vessel in navigation;
 
 
 103
 (2) his duties must be duties that contribute to the function of the vessel; and
 
 
 104
 (3) he must have a more or less permanent connection with the vessel.
 
 
 105
 This test, as explained by the district court in his instructions, does not depart substantially from the test that has developed in this Circuit. We can not say that the district court erred in using this test. Taylor's claim under the Jones Act was properly dismissed and his recovery was properly limited to that available under general maritime law.
 
 LAND AND OFFSHORE SERVICES' DAMAGES
 
 106
 LOS cites as error the damage award it received for the loss of two air compressors and other painting and sandblasting tools and equipment. In addition, LOS compensated its employees for lost personal effects. The district court found that the total value of the equipment was $61,139.00 and that LOS paid a total of $2,618.00 for the personal effects lost by the work crew. However, the district court awarded only $60,000.00 to LOS stating that such amount "will represent fair and adequate compensation to satisfy these claims, considering various counter-balancing factors."
 
 
 107
 Damage awards, being findings of fact, are subject to the clearly erroneous standard. Verrett v. McDonough Marine Service, supra. We should not reverse a district court's factual findings unless we are convinced that an error has been committed. The evidence supports LOS' contention that it proved damages totalling $63,756.37.[5] Although the district court asserts "countervailing factors" which justify reducing the award to LOS by approximately $3,757.00, we can find no support for this reduction in the record. Therefore, we are convinced that the district court erred in not awarding the full amount it found LOS to have lost. LOS should recover the full $63,757.00 that is supported by the evidence and the district court's Findings of Fact.
 
 PREJUDGMENT INTEREST
 
 108
 Appellants Taylor, Milky Way and LOS appeal the district court's failure to award prejudment interest on the amounts to which the court found them entitled. The law in this Circuit is well settled on the issue of prejudgment interest in admiralty cases:
 
 
 109
 As a general rule, prejudgment interest should be awarded in admiralty cases--not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled. Discretion to deny prejudgment interest is created only when there are "peculiar circumstances" that would make it inequitable for the losing party to be forced to pay prejudgment interest. See, e.g., Socony Mobil Oil Co. v. Texas Coastal & International, Inc., 559 F.2d 1008, 1014 (5th Cir.1977); American Zinc Co. v. Foster, 441 F.2d 1100, 1101 (5th Cir.), cert. denied sub nom. Ingalls Shipbuildings Division of Litton Systems, Inc. v. American Zinc Co., 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95 (1971). Ceja v. Mike Hooks, Inc., 690 F.2d 1191, 1196 (5th Cir.1982).
 
 However, the Circuit has further held:
 
 110
 If the trial court does not make any mention of prejudgment interest in its judgment or its findings of fact and conclusions of law, then it is more difficult to infer that the trial court has found peculiar circumstances and decided to exercise the discretion that those circumstances create. Nonetheless, this court may make that inference, and is especially likely to do so when the record clearly discloses peculiar circumstances, or when the case is of a type in which compensation for the delay between injury and judgment has probably been taken into account in determining damages. [citations omitted]. But when no peculiar circumstances are disclosed on the face of the record, and the case is of a type in which peculiar circumstances are less likely to exist, we have reversed the judgment of the district court insofar as it fails to award prejudgment interest. [citations omitted]. We may, as we did in Alcoa Steamship [v. Charles Ferran & Co., 443 F.2d 250], supra, simply modify the trial court's judgment to award prejudgment interest or remand with directions to calculate and award prejudgment interest.
 
 
 111
 Noritake Co. v. M/V Hellenic Champion, 627 F.2d 724, 730 (5th Cir.1980).
 
 
 112
 In the instant case, the district court makes no mention of prejudgment interest in regard to any of the parties involved. It follows, therefore, that there is no discussion of any "peculiar circumstances" which would justify the court's denial of prejudgment interest. Taylor contends that he is owed prejudgment interest from both Milky Way and Chevron. Milky Way claims it is entitled to prejudgment interest from its insurers. LOS, and its compensation insurers, asserts that it is entitled to prejudgment on both its property loss award and the compensation and medical payments made to Taylor.
 
 
 113
 We are mindful that we should not overturn an award, or denial, of prejudgment interest unless the district court was clearly erroneous. Based upon this record, this Court can find no "peculiar circumstances" which justify the denial of prejudgment interest in this case. However, because the issue is within the discretion of the district court, we will remand this question to the district court for the determination of an appropriate award of prejudgment interest. Since we have reversed the district court on the insurance issue, Milky Way's claim for prejudgment interest from its insurers is effectively rendered moot.
 
 CONCLUSION
 
 114
 For the foregoing reasons, the judgment of the court below is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
 
 
 
 *
 District Judge of the Southern District of Texas, sitting by designation
 
 
 [1]
 The endorsement in question was attached to each policy and, although identical in wording, bore differing endorsement numbers
 
 
 [2]
 In addition, La.R.S. Sec. 22:692 appears in Part XV, Chapter 1 of the Louisiana Insurance Code, entitled "Standard Fire Policy," including Secs. 22:691 through, and including 22:695. From Sec. 22:691(F) comes a working definition of a fire loss, taken from the Standard Fire Insurance Policy of the State of Louisiana: "DIRECT LOSS BY FIRE, LIGHTNING AND BY REMOVAL FROM PREMISES ENDANGERED BY THE PERILS INSURED AGAINST IN THIS POLICY."
 
 
 [3]
 La.R.S. Sec. 22:658. Payment of claims, policies other than life and health and accident; penalties
 ... B. (1) Failure to make such payment [under the policy] within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of twelve percent damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney fees for the prosecution of such loss ... (Emphasis added.)
 La.R.S. Sec. 22:658 (West's 1986).
 
 
 [4]
 Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970)
 
 
 [5]
 The district court found a total of $63,757.00, obviously preferring to round to the next highest dollar figure. We do not find error in the 63 cents difference as a result of rounding up