749 F.2d 255
 Guy D. DiPASCAL and/or Barbara C. DiPascal, Individually and
On Behalf of Their Daughter Gina DiPascal,
Plaintiffs-Appellees Cross-Appellants,
v.
NEW YORK LIFE INSURANCE COMPANY, Defendant-Appellant Cross-Appellee.
 No. 83-3598.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 2, 1985.
 
 Virginia N. Roddy, Eugene R. Preaus, New Orleans, La., for defendant-appellant cross-appellee.
 Patrick D. Breeden, New Orleans, La., for plaintiffs-appellees cross-appellants.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before RUBIN, POLITZ and GARWOOD, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 This claim for benefits under a group major medical insurance policy ought to be a simple case, the resolution of which could readily be found in the provisions of the policy or, if the policy provisions are not in compliance with the Louisiana Insurance Code, then in the statute. The facts are indeed undisputed. Barbara DiPascal is an employee of the Jefferson Parish School Board. She and her dependent daughter, Gina, were covered by a group major medical policy issued by New York Life Insurance Company, the terms of which limited benefits for mental or nervous disorders to a $25,000 lifetime maximum, but afforded greater benefits for other major illnesses. The Louisiana Supreme Court had, however, previously decided that the insurer who issued such a policy was required by the Louisiana Insurance Code to offer optional coverage for mental disability under the same circumstances and conditions as for other illnesses. Gina was hospitalized for mental illness. After her hospitalization commenced, the group policy was amended and renewed. In connection with the issuance of the amended policy, New York Life in October 1981 sent a letter to the School Board offering coverage for mental disorders on the same terms as for other illnesses, for a 5% increase in rates. The School Board in writing refused the offer of commensurate coverage for mental disorders. The amended policy, effective November 1, 1981, like the first policy, contained a $25,000 limit on mental disability coverage. The expenses of Gina's illness continued through the term of the amended and renewed policy.
 
 
 2
 Mr. and Mrs. DiPascal contend that the insurance company is liable for all of their daughter's expenses whether incurred during the term of the earlier policy or that of the later amendment. New York Life asserts that its liability under the first policy is limited to $25,000 for mental disability expenses, and that the amendment likewise limits mental disability coverage to a $25,000 lifetime maximum.
 
 
 3
 The result we think a Louisiana court would reach, based on Louisiana judicial interpretations of the state Insurance Code, and the one we are Erie -bound to follow in this diversity case, was reached by the district court. The policy initially issued must be read to cover all of the expenses arising from Gina's mental disability, commensurably with coverage for other illnesses, beginning while the policy was in effect, including those incurred during the term of the amendment. Accordingly, we affirm the district court's judgment in this respect. Because the insurer nonetheless had reasonable grounds to refuse to pay the DiPascals' claim, we also affirm the judgment denying them penalties and attorney's fees.
 
 I.
 
 4
 The School Board requested a bid from New York Life on a major medical expense group insurance contract, to become effective October 1, 1980. The coverage was to replace a policy issued by Occidental Life Insurance Company which limited mental health coverage to $25,000, but which extended greater coverage for other major illnesses. The School Board's bid solicitation simply incorporated many of the terms of the previous Occidental Life policy, including the $25,000 limit on mental health coverage. New York Life's bid response and policy, which were accepted, provided, "When Major Medical Benefits become payable, there is no limit on the amount of such benefits payable for each covered person for all charges he incurs during his lifetime, except that the following maximums apply to certain specified charges.... The maximum amount of Major Medical Benefits payable for all covered charges incurred during a covered person's entire lifetime for medical care due to nervous or mental disorders, regardless of whether Major Medical Insurance has been continuous or interrupted, is $25,000." The certificates of insurance issued to employees of the School Board who elected coverage also contained that limitation.
 
 
 5
 The Louisiana Insurance Code, Sec. 213.2A,[1] provided in part:
 
 
 6
 Every insurer authorized to issue policies of health and accident insurance in this state shall offer to all prospective group ... policyholders at their option a provision in the insurer's health and accident insurance policies which shall state that benefits shall be payable for services rendered for the treatment of mental and/or nervous disorders, under the same circumstances, conditions, limitations, and exclusions as benefits are paid under those policies for all other diagnoses, illnesses or accidents....
 
 
 7
 Louisiana courts had originally interpreted this statute as inapplicable to group major medical expense or hospitalization insurance because such insurance was not considered "health and accident insurance."[2] The Louisiana Supreme Court thereafter decided, in Rudloff v. Louisiana Health Services & Indemnity Co.,[3] that hospitalization and major medical insurance was "health and accident" insurance. Accordingly, the court held that the Louisiana Insurance Code required major-medical expense insurers to offer the same optional coverage for the treatment of mental disorders as they offered for the treatment of other major illnesses. If such an offer had not been made, the policy was to be read as if the mandated offer of commensurate mental health coverage had been made and accepted. Hence, the Rudloff policy was reformed to provide the coverage that had not been offered.
 
 
 8
 The Rudloff policy specifically precluded benefits for mental illness, whereas the policy in this case limits such coverage to $25,000. There is no significant distinction between a policy that precludes mental health benefits and one that limits mental health benefits: each is equally contrary to the statute, as interpreted in Rudloff, if the insurer fails to offer the commensurate coverage option in the policy.
 
 
 9
 The New York Life policy was issued after Rudloff was decided, and that case therefore compels us to reform the policy to provide the same coverage for mental disorders as it provided for other illnesses. Gina DiPascal was hospitalized for treatment of a mental disorder in March 1981, and her mother submitted claims for her expenses to New York Life. By August 20, 1981, New York Life had paid Mrs. DiPascal $25,000. It then informed the DiPascals that it had paid its maximum. Later, however, after Mrs. DiPascal had employed counsel, New York Life agreed to pay for all expenses incurred through the term of the first policy, ending September 30, 1981, and thus paid the additional sum of $24,558.65.
 
 
 10
 New York Life contends that, in offering the initial coverage in October, 1980, it was merely responding to the specifications the School Board had included in its invitation to bidders, and that its liability was limited to $25,000; it voluntarily paid more than was required. The facts on which the argument is premised are correctly stated, but in rejecting the conclusion sought to be drawn, the district court found that the intent of the Louisiana legislature, as interpreted in Rudloff, was to promote the availability of coverage for mental disorders by ensuring that the insured understands he has the option of purchasing mental disorder coverage under the same conditions as other coverages. Group policies are often obtained by solicitations for bids. The legislature must have been aware of this, yet the statute makes no exception for bid solicitations from potential insureds, even those that specify limited mental disorder coverage. That the insurance was solicited, by bid or otherwise, did not relieve the insurer of its duty to offer optional mental disorder coverage identical to other-illness coverage. Rudloff requires that the policy initially issued be read as if such an offer had been made and accepted. New York Life was therefore obligated to pay at least the expenses incurred during the term of the first judicially reformed policy.
 
 
 11
 The more difficult issue presented, however, is whether the DiPascals are entitled to commensurate coverage for expenses incurred after the policy was amended in October, 1981. That amended policy contains a $25,000 lifetime limit on mental disorder coverage, but it was written only after commensurate coverage had been offered to and declined by the School Board. New York Life contends that its offer of commensurate mental health coverage satisfied its obligation under the Insurance Code, and that the School Board's rejection of commensurate coverage under the amended policy ended any further obligation to pay for Gina's additional medical expenses. It cites provisions of the policy stating that major medical benefits are payable only as specific expenses accrue. New York Life argues that, under the policy as initially issued, the DiPascals' rights to benefits vested only as specific charges were incurred. Because it has in fact paid for all expenses that were incurred during the term of the policy as initially issued, it contends that the DiPascals have no vested right to benefits for expenses incurred after the effective date of the October 1981 amended policy, even though these post-amendment expenses resulted from a disability commencing during the term of the first judicially reformed policy.
 
 
 12
 The Louisiana Supreme Court recently decided, in Cataldie v. Louisiana Health Service and Indemnity Co.,[4] that the benefits due under a non-group family health and accident insurance policy may not be reduced once a covered illness begins, even if the policy terminates by agreement with the insured. The Cataldie policy, like the policy in the present case, conditioned the payment of benefits upon the accrual of specific medical expenses. The Louisiana Supreme Court rejected arguments that the risk insured by the contract was the rendering of specific medical services and that Cataldie had only a vested right to payment for services rendered before modification or cancellation of the policy. The majority stated that "perhaps in a narrow sense of esoteric legal doctrine Cataldie's claim originating before cancellation could be said to be restricted to medical bills rendered on or before this date ... [However,] in the popular use and usual meaning of words, Cataldie had a claim for major medical services related to his daughter's cancer of which the insurer was notified and which originated before it cancelled the policy."[5]
 
 
 13
 There are distinctions between Cataldie and the present case. In Cataldie, the court found that the insurer unconscionably increased the insured's premiums after commencement of the illness, forcing him to agree to cancellation of his policy. In the present case, the insured School Board was offered commensurate mental disorder coverage, voluntarily rejected that coverage, and entered into an amended policy providing limited mental disorder benefits. The Cataldie court decided its case under L.S.A.-R.S. 22:213(B)(7), which provides that cancellation of a health insurance policy "shall be without prejudice to any claim originating prior thereto."
 
 
 14
 We do not think, however, that the Louisiana Court would find these distinctions controlling. Whether a policy is cancelled or amended, the insured faces the same risk, that benefits for the medical expenses of a continuing illness will be reduced or terminated before that illness ends.[6] Although L.S.A.-R.S. 22:213(B)(7) is not directly applicable to the present group policy case,[7] in which the insurer did not make an unconscionable attempt to bring about cancellation of the policy, we are controlled by the Cataldie court's finding that an insured's right to benefits for post-termination medical expenses vested upon commencement of the illness. Under this rationale, subsequent modification of an insurance policy cannot prejudice rights that have vested prior to the amendment.[8] We cannot logically limit the reasoning of Cataldie to cases of unilateral or unconscionable action by the insurer bringing about cancellation of the policy. As the Cataldie court stated, "the legal principles which we conclude govern this case are applicable to a cancellation by either the insured or the insurer."
 
 
 15
 Neither can we draw any meaningful distinction between a group and an individual policy. The Louisiana rule protecting the insured against subsequent changes in the insurance contract applies with equal force in this case.
 
 
 16
 Accordingly, we hold that the subsequent amendment of the group policy could not prejudice the DiPascals' claim to coverage of medical expenses of the illness, which commenced prior to the amendment. Under the initial judicially reformed policy, interpreted in the light of Louisiana's public policy, Gina is entitled to commensurate coverage of the expenses of her mental illness.
 
 
 17
 This conclusion makes it unnecessary for us to decide whether the insurer's offer of commensurate mental disorder coverage in a writing closely associated with the amended policy satisfied the requirements of either L.S.A.-R.S. 22:213.2 A (then in force) or 22:669 A.
 
 
 18
 After the 1981 amended policy was issued, the Louisiana legislature repealed Sec. 213.2 A and enacted Sec. 669, the pertinent text of which is set forth in the footnote.[9] Section 669 A is similar in substance to Sec. 213.2 A, but Sec. 669 D provides that policies in effect on January 1, 1982 shall, on the anniversary date of such coverage, be "covered" in conformance with the substantive provisions of the statute and that existing coverage shall be converted to conform to the statute no later than January 1, 1983. These provisions create no inference that the legislature has sanctioned lesser coverage in policies that, as judicially reformed by Rudloff, were already read to provide commensurate benefits for mental disorders. Section 669 is broader than Sec. 213.2, for it covers not only health and accident insurance but also self-insurance plans and the Louisiana State Employees Uniform Group Benefit Plan. It was likely enacted at least in part to clarify the issue raised by Wheelahan v. State of Louisiana,[10] in which a Louisiana court of appeals questioned whether the Louisiana State Employee Uniform Group Benefit Plan was an insurance plan covered under the Insurance Code, or was a non covered self insurance plan. Thus, the "conformance" language in Sec. 669(D) was probably directed only to those self insurance and state plans, or other plans, that were not explicitly covered under old Sec. 213.2 but are now covered under Sec. 669(A). Section 669(D) should not be read to preclude judicial reformation of a policy covered by Sec. 213.2 at the time of its issuance, as was the School Board policy.
 
 
 19
 Were we interpreting the policy without any consideration of Louisiana decisions defining the state's public policy, we might agree with New York Life's construction of its policy. It is our duty, however, to view ourselves in diversity cases as an inferior state court and to reach the decision that we think a state court would reach.[11] Louisiana courts have interpreted the state's Insurance Code in a fashion favorable to the insured and have construed policies to require benefits that a literal reading might not exact. We follow Erie's mandate by adhering to their decisions.
 
 
 20
 New York Life suggests that, if we do not agree with its interpretation, we certify the questions raised by this case to the Louisiana Supreme Court. While we do not hesitate to seek the guidance of a state supreme court when we think the state law issues genuinely unsettled, the Louisiana Court has given us ample guidance in the decisions cited in this opinion. We would shirk our duty and impose unnecessarily on that court if we solicited its views on matters about which it has so recently spoken.
 
 
 21
 Our analysis makes it unnecessary for us to discuss the DiPascals' contention that the Louisiana Insurance Code views each individual insured under a group policy as a policyholder and requires that each be extended an individual option of mental disorder benefits equal to benefits for other disorders.[12]
 
 
 22
 We do not enter into this exercise because Mrs. DiPascal's initial contract, as it would be reformed by Louisiana courts, required payment of the full sum claimed.[13]
 
 II.
 
 23
 The district court denied the DiPascals' claim for penalties and attorney's fees for non-payment of the claim because New York Life's refusal to pay was not "arbitrary, capricious, or without probable cause." The Louisiana Insurance Code, the pertinent provisions of which are set forth in the margin, requires claims to be paid "unless just and reasonable grounds, such as would put a reasonable and prudent businessman on his guard, exist," under penalty of paying double the amount due plus attorney's fees.[14] Although the district court properly cited Sec. 657 A, it may have applied the test stated in Sec. 658,[15] which applies to policies other than life and health and accident and exacts penalties and attorney's fees only if nonpayment is found to be "arbitrary, capricious, or without probable cause." We note that the plaintiffs' attorney argued the incorrect standard in his memorandum to the district court, in which he stated that "the decision of New York to deny coverage was arbitrary, capricious and without probable cause."
 
 
 24
 Section 657 A applies to the group policy in the present case, which, under Rudloff, is to be treated as "health and accident" insurance. In applying Sec. 657 A, the Louisiana courts have held that an insurer's misinterpretation of its policy of health and accident insurance is not a reasonable ground to deny payment, and have required the insurer to pay penalties and the attorney's fees incurred by the insured in compelling the insurer to fulfill its obligation.[16] The insurer "takes the risk of misinterpreting its policy."[17]
 
 
 25
 As discussed above, New York Life paid all expenses incurred during the term of the first policy, through October 31, 1981. Thus, the DiPascals can claim penalties and attorney's fees only for the insurer's denial of coverage for expenses incurred after that date. The policy, on its face, provided for payment of medical expenses only as they accrued. Hence, New York Life's refusal to pay for Gina's expenses accruing after the term of the first judicially reformed policy was based on an accurate interpretation of the policy's provisions. New York Life did not misinterpret its policy; it failed to anticipate that the Louisiana Supreme Court would find as a matter of public policy that, despite the terms of the policy, the insured's rights vested upon commencement of her illness, requiring coverage of all medical expenses for the duration of that illness.
 
 
 26
 The insurer's failure to anticipate the Cataldie decision should not subject it to penalties or attorney's fees under Sec. 657 A. In Rudloff v. Louisiana Health Services & Indemnity Co., the Louisiana Supreme Court refused to impose statutory penalties and attorney's fees upon an insurer that had failed to offer commensurate mental health coverage as required by Sec. 213.2. The court found that the insurer had justifiably relied upon a previous Louisiana Supreme Court decision which had held that a hospitalization policy was not a health and accident contract governed by Sec. 213.[18] The court in Rudloff concluded that the "defendant was justified in relying on its policy exclusion and is not liable for penalties and attorney's fees."[19] Similarly, in the present case, New York Life might reasonably have relied upon prior Louisiana precedent upholding its clause providing for payment of medical expenses only as they accrued. In Tabb v. Louisiana Health Service and Indemnity Co.,[20] decided by the Louisiana Supreme Court in 1978, the plaintiff was injured and hospitalized prior to his employer's cancellation of a group policy, and he sought payment for medical expenses incurred after the date of cancellation. The Louisiana Supreme Court found that public policy did not prohibit a contractual provision that no subscriber would be paid for medical services received after termination of the contract. The policies in the present case were issued after Tabb but before Cataldie. We conclude that New York Life had "just and reasonable grounds" to deny payment of the DiPascals' claim for medical expenses incurred after October 31, 1981.
 
 
 27
 Our holding is not inconsistent with either our reasoning in Boudreaux v. Fireman's Fund Insurance Co.[21] or the Louisiana rule that "an erroneous, though reasonable interpretation of the policy by an insurer subjects the insurer to the statutory penalty and attorney's fees."[22] In Boudreaux, we stated that "we are convinced that the parameters of reasonable coverage denials, based on policy interpretations, will remain very narrow." The present case is an "unusual fact situation"[23] in which it is inappropriate to impose penalties or attorney's fees upon the insurer.
 
 
 28
 For these reasons, the judgment is AFFIRMED.
 
 
 
 [1]
 L.S.A.-R.S. 22:213.2A (emphasis added)
 
 
 [2]
 See Tabb v. Louisiana Health Service & Indemnity Co., 361 So.2d 862 (La.1978) and the original opinion in Rudloff v. Louisiana Health Services and Indemnity Co., 385 So.2d 767 (La.1979)
 
 
 [3]
 385 So.2d 767 (La.1980)
 
 
 [4]
 456 So.2d 1373 (La.Sup.Ct.1984), reh. denied --- So.2d ---- (La. Dec. 6, 1984)
 
 
 [5]
 At 1376
 
 
 [6]
 In Cataldie, one of the dissenting justices treated the insurer's actions as a contractually permitted modification of the policy, which the insured accepted by paying the increased premium to retain coverage for his daughter
 
 
 [7]
 See L.S.A.-R.S. 22:221
 
 
 [8]
 See Wharton v. Louisiana Hospital Service, Inc., 183 So.2d 133 (La.App. 1st Cir.1966), writ ref'd, 249 La. 62, 184 So.2d 734 (1966); Peters v. Life General Sec. Insurance Co., 400 So.2d 1103 (La.App. 1st Cir.1981), writ denied, 403 So.2d 70 (La.1981)
 
 
 [9]
 Sec. 669. Mental and nervous disorders; policy provisions; minimum requirements; group, blanket, and franchise policies
 A. Every person authorized to issue a hospital or medical expense policy, a hospital or medical service contract, and employee welfare benefit plan, a health and accident insurance policy, or any other insurance contract of this type in this state, including a group insurance plan, a self-insurance plan, and the Louisiana State Employees Uniform Group Benefits Program, shall offer in all group, blanket, and franchise policies an optional provision in the policy, contract, benefit plan, agreement, or program which states that benefits shall be payable for services rendered for the treatment of mental or nervous disorders, or both, under the same circumstances and conditions as benefits are paid under those policies ... for all other diagnoses, illnesses, or accidents....
 * * *
 D. All provisions of this Section shall apply to all new policies, contracts, programs, or plans issued after January 1, 1982. Any policies, contracts or plans in effect on January 1, 1982 shall, on the anniversary date of such coverage, be covered in conformance with this Section; however, all existing coverage shall be converted to conform to the provisions of this Section no later than January 1, 1983.
 
 
 [10]
 376 So.2d 576 (La.App. 4th Cir.1979)
 
 
 [11]
 Comer v. Texaco, Inc., 514 F.2d 1243 (5th Cir.1975); 1A Moore's Federal Practice, Sec. 0.309, and authorities cited therein
 
 
 [12]
 See Watkins v. Metropolitan Life Ins. Co., 174 So. 885 (La.App. 1st Cir.1937) ("in a policy of group insurance, the contract is one between the insurance company and the employer, and ... the insured employee is only incidentally a party thereto."). Compare the language in Rudloff, "At issue is whether defendant, Blue Cross, was required by LSA-R.S. 22:213.2 to offer optional insurance coverage for the treatment of mental and/or nervous disorders to policyholders under their group agreement with the City of New Orleans, ...." (emphasis added). 385 So.2d at 769. "The question is what remedy is available to a policyholder who has not been offered mental disability coverage by the insurer." (emphasis added). Id. at 771
 
 
 [13]
 See, for example, Burke v. Occidental Life Ins. Co. of Cal., 416 So.2d 177, 179 (La.App. 4th Cir.1982)
 
 
 [14]
 L.S.A. R.S. 22:657 A provides in part:
 All claims arising under the terms of health and accident contracts ... shall be paid ... unless just and reasonable grounds, such as would put a reasonable and prudent businessman on his guard, exist.... Failure to comply with the provisions of this Section shall subject the insurer to a penalty payable to the insured of double the amount of the health and accident benefits due under the terms of the policy or contract during the period of delay, together with attorney's fees to be determined by the court.
 
 
 [15]
 L.S.A. R.S. 22:658
 
 
 [16]
 See Boudreaux v. Fireman's Fund Insurance Co., 654 F.2d 447, 450 (5th Cir.1981) (applying Sec. 658 but discussing at length Sec. 657); Peters v. Life General Sec. Ins. Company, 400 So.2d 1103 (La.App. 1st Cir.1981), writ denied, 403 So.2d 70 (La.1981); Paret v. Louisiana Health Service & Indemnity Company, 366 So.2d 634 (La.App. 3rd Cir.1978)
 
 
 [17]
 Boudreaux v. Fireman's Fund Insurance Company, supra, 654 F.2d at 452
 
 
 [18]
 Tabb v. Louisiana Health Service and Indemnity Co., 361 So.2d 862 (La.1978)
 
 
 [19]
 385 So.2d at 771. See Cotlar v. Gulf Ins. Co., 318 So.2d 923 (La.App. 4th Cir.1975) (res nova question of whether Mardi Gras doubloons were numismatic property. Insurer did not act unreasonably in claiming that they were); Valladares v. Monarch Ins. Co., 282 So.2d 569 (La.App. 4th Cir.1973) (res nova issue of whether plastic surgery expenses were covered under an automobile policy; insurer's denial of coverage was reasonable). See also Carney v. American Fire and Indem. Co., 371 So.2d 815, 819 (La.1979)
 
 
 [20]
 361 So.2d 862 (La.1978)
 
 
 [21]
 654 F.2d 447, 452 (5th Cir.1981)
 
 
 [22]
 Id. at 452, quoting Offshore Logistics Services, Inc. v. Arkwright-Boston Manufacturers Mut. Ins. Co., 639 F.2d 1142, 1145 (5th Cir.1981)
 
 
 [23]
 See Boudreaux, supra, 654 F.2d at 452