KLIEBERT, Judge.
Plaintiff, Reagan Equipment Company, sued its former employees’ group medical insurer, New York Life Insurance Company (New York) and its subsequent replacement insurer, Pan American Life Insurance Company (Pan Am) for the recovery of $474,831.34 in medical expenses, the burden of which was borne by Reagan on behalf of an employee’s wife. In essence, Reagan contends either one or both of the major medical insurers are liable for the medical expenses because the Louisiana Insurance Code, LSA-R.S. Title 22:1 et seq., prohibits a gap in coverage when substituting one insurance carrier for another by imposing the liability on the initial carrier and/or its successor, depending upon the factual situation prevailing at the time.
Alternatively, Reagan sought recovery from Aetna Life and Casualty Company (Aetna) under a fiduciary responsibility policy. Reagan contends the policy does or should have provided coverage for Reagan’s breach of a fiduciary responsibility, i.e., the failure to obtain major medical insurance coverage for employees who were ill and incurring medical expenses at the time the insurer was replaced. In the further alternative, in the event the Aetna policy failed to provide such coverage, then Reagan contends St. Paul Fire and Marine Insurance Company (St. Paul), the errors and omissions carrier of the insurance agency which secured the Aetna policy for Reagan, is liable for failing to obtain such coverage.
From a judgment which dismissed, after trial on the merits, its suit against all defendants plaintiff brought this appeal. We affirm the judgment in all respects.
FACTS
Reagan Equipment Company has provided major medical insurance coverage for its employees for over thirty years. In September of 1979 Reagan submitted specifications for group hospitalization and life insurance programs to several carriers, including New York and Aetna. New York submitted the winning proposal and a one year policy issued by the company went into effect on January 1, 1980. The previous carrier’s (Blue Cross’) policy provided only limited extended benefits, i.e., a $100.00 maximum for individuals entitled to or drawing benefits as of the date the policy terminated. After negotiations with Reagan, New York agreed to provide transitional protection for employees and/or dependents confined to a hospital on the New York policy’s effective date of January 1, 1980. In exchange for transitional protection at the policy’s inception New York limited extended benefits upon termination of its policy (scheduled for renewal or termination on January 1,1981) to those available under the Blue Cross policy it replaced, i.e., the $100.00 maximum.
In the latter part of 1980 New York informed Reagan renewal premiums would be increased due to a high claims experience. Reagan immediately sought alternative coverage and, as the search continued into 1981, renewed the New York policy on a month-to-month basis at an average pre *255 mium of $40,000.00 per month. An employee benefits consultant retained by Reagan, Mr. Guibault, informed its personnel manager, Mr. Ed Cooper, that there were limited extended benefits under the New York policy for persons entitled to draw or drawing benefits on the termination date. Nevertheless, New York’s offer to accept a supplemental premium to assume responsibility for transitional coverage was rejected by Reagan. (The record does not reflect the premium cost for such coverage).
Effective July 1, 1981 Pan Am issued its policy and became the employees’ group major medical insurer under a minimum premium plan. Premiums, which represent actual claims experience plus administrative costs, subject to a maximum cap, were approximately $10,000.00 per month. The policy, however, did not provide transitional protection for persons disabled on its effective date and in fact excluded as ineligible for coverage dependents who were hospitalized on the policy’s effective date. By letter dated July 30,1981, Pan Am memorialized an agreement with Reagan whereby it would process and pay the claims of persons disabled at the termination of the New York policy and Reagan would reimburse Pan Am for the claims paid plus 7½% for administrative fees. However, Reagan later claimed it thought the cost-plus agreement pertained only to certain claims arising from pregnancies.
Mrs. Marion Gregoire, the wife of a Reagan employee, was hospitalized on May 18, 1981, prior to termination of the New York policy. She remained hospitalized until her death from cancer on March 17, 1982. New York paid $58,592.46 in claims submitted on her behalf prior to their policy’s termination date, plus $100.00 in extended benefits. Subsequent to termination of the New York policy Mrs. Gregoire incurred medical expenses totalling $474,831.34. These claims were processed by Pan Am pursuant to the cost-plus agreement detailed in the letter of July 30,1981. Thereafter, Reagan reimbursed Pan Am for its payments. When the size of the claims became known, Pan Am agreed to accept a flat administration fee of $2,500.00 rather than 772% of the costs. The claim of a Reagan employee, other than Mrs. Gre-goire, who was disabled due to a heart condition, was likewise handled on a cost-plus basis.
Despite the exercise of the cost-plus agreement encompassed in the July 30, 1981 letter, Reagan, who calculated its own premiums, paid a premium for Mrs. Gre-goire under the minimum premium plan from July through September of 1981. Pan Am discovered the payment and refunded the premium. In late February or early March of 1982 Mr. Guibault and Mr. Cooper met with a Pan Am representative, Dudley Brown, for the purpose of convincing him that Mrs. Gregoire’s claims should be covered under the minimum premium plan. According to Guibault, upon reviewing the cost-plus agreement, he believed the possibility of convincing Pan Am to pay the claims pursuant to the minimum premium plan was non-existent. (Cooper had not previously informed Guibault of the existence of the cost-plus agreement encompassed in the July 30, 1981 letter).
Notwithstanding Mrs. Gregoire’s death on March 17, 1982, on advice of counsel Reagan included in one of its monthly premiums to Pan Am a premium on her behalf from the date the minimum premium plan went into effect to about March of 1982. Pan Am became aware of this during its preparation for trial. Hence, it gave a credit for the premium on its reconventional demand for administrative fees.
On April 15, 1982 Reagan sent a letter to New York requesting it “confirm its liability” for expenses generated by the illness of Marion Gregoire “both prior to and subsequent to June 30, 1982.” New York ultimately denied liability for all expenses incurred subsequent to the policy termination date beyond the $100.00 maximum.
Reagan also sent a letter on April 15, 1982 to Aetna requesting written confirmation of coverage under Fiduciary Responsibility insurance policy No. 39FF305BCA (replacing policy No. 39FF988CA) for claims arising as a result of Reagan’s possible failure to provide for extended bene *256 fits upon the termination of the New York Life Policy.” Aetna denied coverage for the claim on the following basis:
“We direct your attention to the endorsement on your policy 39 FF 305 BCA which reads as follows:
‘REAGAN EQUIPMENT COMPANY PROFIT SHARING AND EMPLOYEE SAYINGS PLAN; REAGAN EQUIPMENT COMPANY PENSION PLAN and any other Trust or Employee Benefit Plan for which an application, Form F-1194 has been provided to the Company.’ This Form F-1194 provides the mechanism for adding additional plans to your policy. In view of the absence of F-1194 Form, we must take the position that there is no coverage for the Group, Health, Life, Disability and Accident Plan under the above policy.”
When Reagan secured the Fiduciary Responsibility policy in 1976 through the Leon Irwin & Company insurance agency, the complete name of the designated plan was Reagan Equipment Company Retirement Savings Plan and any other employee benefit plan ... now in operation ... which is the subject to the ERISA of 197j and of which Reagan Equipment is the sole sponsor.” Subsequent renewals contained the same language. However, in 1980 and thereafter renewal certificates listed the designated plan as “Reagan Equipment Company Profit Sharing and Employee Savings Plan, Reagan Equipment Company Pension Plan and any other ... Employee Benefit Plan for which an application, Form F-1194, has been provided to the company.” The agency which secured the renewal certificates[1] failed to file a form F-1194 for Reagan’s group major medical plan. The alternative claim against St. Paul, the errors and omissions carrier for the Bailey Agency, is grounded in the failure of the agency to file the F-1194 form.
At the close of plaintiff’s case the trial judge concluded neither New York nor Pan Am was obligated by contract or under the Insurance Code to reimburse plaintiff for expenses paid on Mrs. Gregoire’s behalf. Accordingly, the court granted motions by New York and Pan Am dismissing the plaintiff’s claims against them. After presentation of defense by Aetna and St. Paul the case was taken under advisement. Thereafter, the court rendered a judgment which dismissed Reagan’s claims.
ARGUMENTS
Reagan argues its case asserting coverage under either or both of the group policies as though it was in fact the disabled-insured claimant and by virtue of each carrier’s interpretation of its policy left without coverage where the claimant’s illness commenced prior to termination of the original policy and continued into the replacement carrier’s coverage period. It is true, as urged by Reagan, that courts have held that Louisiana’s Public Policy opposes and, under the law (LSA-R.S. 22:215.6) in effect at the time the claim arose, prohibited a “gap” in the insurance coverage of a claimant arising solely by virtue of the replacement of the insurance carrier. Cataldie v. Louisiana Health Service & Indem., 456 So.2d 1373 (La.1984); Breland v. Louisiana Hospital Service, Inc., 468 So.2d 1215 (La.App. 1st Cir.1984); DiPascal v. New York Life Ins. Co., 749 F.2d 255 (5th Cir.1985); Cabibi v. Louisiana Health Service & Indem., 465 So.2d 56 (La.App. 4th Cir.1985). However, the issue involved here is not lack of coverage for the claimant, but rather, which of those organizations engaged in providing coverage must now bear the burden of the Gre-goire claim under the facts of this case.
From a careful review of the record, it is apparent Reagan personnel were know-ledgable, were aware of the requirements of the insurance code and the coverage provided under standard policies, and had negotiated with insurance carriers in the past in order to provide coverage for those employees and their dependents who were entitled to or drawing benefits at the time an insurance carrier was replaced.
*257 As a result of initial negotiations with Reagan and Reagan’s refusal to pay a supplemental premium for “gap” coverage, the New York policy provided there would be no extended coverage beyond the termination date of its policy. In consideration of the July 30, 1981 letter agreement with Reagan, the Pan Am policy, on the basis of its eligibility requirements, excluded “gap” coverage. Under the letter agreement Pan Am would process the “gap” claims and bill Reagan for the amount of the claims paid plus an administrative fee of 7½%. Pursuant to this agreement, Pan Am paid the claims and billed Reagan who in turn paid Pan Am.
It was not until the size of Mrs. Gre-goire’s claim became apparent that Reagan commenced looking for some way to avoid its liability as an insurer of the “gap” claim. The cases cited by Reagan in support of its argument all dealt with situations where the court believed an injustice would be sanctioned by permitting the insurance carrier to terminate the risk after the illness or disability giving rise to the claims had occurred. Here, there is no contention or inference that Reagan was taken advantage of or that exorbitant premium increases by New York forced it to terminate the New York policy. To the contrary, it is apparent from the record that Reagan made a business decision to self-insure coverage or pay a premium computed as claims costs plus 7½% administrative charges for coverage by Pan Am out of a desire to reduce its overall premium costs. Unfortunately for Reagan, the size of the Gregoire claim which Reagan had elected to self-insure was higher than the premium cost and ultimately made the decision a poor business judgment.
Acting on the foregoing evidence, the trial court reformed the Aetna policy to include Reagan’s major medical plan in its coverage but thereafter rejected Reagan’s claim under the policy on the grounds that Reagan’s decision to bear the cash burden of “gap” claims was a conscious business decision rather than a “wrongful act” as contemplated by the fiduciary policy. Reagan contends if a “gap” was created as a result of its decision to switch carriers, it breached a fiduciary duty to the Gregoires. However, we have already determined there was no “gap” for Reagan assumed the burden of claims such as Mrs. Gre-goire’s. Thus, Reagan did not breach fiduciary duties owed to the Gregoires and accordingly cannot recover under the fiduciary responsibility policy.
The reformation of the Aetna policy to provide coverage for the major medical plan rendered moot Reagan’s claim against St. Paul for the error committed by Bailey-Yega-Posecai, Inc. in failing to file the F-1194 form.
After a careful review of the record, we cannot say the trial judge erred in reaching his decision and, accordingly, we affirm his judgment. Costs of the appeal are to be borne by Reagan.
AFFIRMED

. The firm of Bailey, Englehart & Vega secured the 1980-81 renewal. Its successor firm, Bailey-Vega-Posecai, Inc., secured the 1981-84 renewal.