**OMP, a Mississippi General Partnership and Lasercraft, Ltd., a Mississippi Limited Partnership, Plaintiffs,**

v.

**SECURITY PACIFIC BUSINESS FINANCE, INC., a Delaware Corporation, Defendant.**

**SECURITY PACIFIC BUSINESS FINANCE, INC., Counterplaintiff,**

v.

**Pryor Spencer BAILEY, As General Partner of OMP; Leslie Banks Brasell, As General Partner of OMP; O.A. Cleveland, Jr., As General Partner of OMP; Lasercraft, Ltd., a Mississippi Limited Partnership, Counterdefendants.**

**Civ. A. No. WC 86–132–D–D.**

United States District Court, N.D. Mississippi, W.D.

June 9, 1989.

See also 716 F.Supp. 239.

James L. Bonner, Olive Branch, Miss., J.P. Coleman, Ackerman, Miss., Briggs Smith, Smith, Phillips & Mitchell, Batesville, Miss., and Eugene Greener, Jr. and Henry C. Shelton, III, Schneider & McQuiston, Memphis, Tenn., for plaintiffs and counterdefendants.

John Dunbar, Holcomb, Dunbar, Connell, Chaffin & Willard, Oxford, Miss., for defendant and counterplaintiff.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

This action was heard in the United States District Court on December 15 and 16, 1988. The request for a deficiency judgment award is the only issue remaining. After having considered the oral and documentary proof received at trial, together with the parties' briefs and proposed findings of fact and conclusions of law, the court makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.[1]

## I.

## FINDINGS OF FACT

### A. Procedural Background

OMP and Lasercraft brought this action on September 30, 1986 against Security Pacific Business Finance, Inc. and its trustee ("Security Pacific" or "lender"). Security Pacific counterclaimed in October 1986 against Lasercraft, Robert F. McMillan ("McMillan"), and OMP partners Pryor

Spencer Bailey ("Bailey"), Leslie Banks Brasell ("Brasell"), and O.A. Cleveland, Jr. ("Cleveland"). Claims against the counterdefendants (collectively referred to as "debtors") remain. This action involves the possession and title to a motel property located in Oxford, Mississippi and connected loan agreements.

The court has previously addressed and decided a number of issues and claims involved in the case *sub judice*. On November 17, 1986, the court ordered the counterdefendants to deliver possession of the motel property to Security Pacific. On April 14, 1988, the court granted Security Pacific's motion for summary judgment rejecting all claims made by the original plaintiff and counterdefendants and awarding partial summary judgment on Security Pacific's counterclaims. On May 17, 1988, the court entered a decree to quiet and confirm title in favor of Security Pacific to the motel property and land at issue. The court incorporates the findings of fact and conclusions of law made in these previous rulings.

The property at issue, presently known as the University Inn (the "Inn"), has had a troubled past. In October 1983, Thunder Corporation ("Thunder") acquired title to the University Inn, obtaining money to buy the Inn by executing and delivering a certain promissory note secured by a deed of trust and dated October 19, 1983 in the principal amount of $1,847,144 payable to the order of Security Pacific. The deed of trust conveyed the Inn in trust to Security Pacific. Thunder simultaneously executed a subordinate purchase money note to Lasercraft in the amount of $543,200 and executed a second deed of trust subordinate to Security Pacific's security interest. Thunder subsequently entered bankruptcy and Security Pacific's note went into default. Relief from the automatic bankruptcy stay was obtained to allow Security Pacific and Lasercraft to foreclose.

---

1. This opinion supersedes and replaces this court's unpublished memorandum opinion of

January 27, 1989.

In June 1985, Security Pacific made an additional $175,000 loan to Bailey, Brasell, and McMillan. The "adjacent" note was secured by a 6.5 acre tract of land adjacent to the Inn and was to be used for operating expenses and refurbishing at the Inn. Lasercraft subsequently foreclosed on its security interest in the Inn and transferred the property to OMP. OMP took possession and began operating the Inn during the summer of 1985.

OMP sought to continue operations of the Inn. OMP and Security Pacific conducted lengthy negotiations between June and October 1985. A settlement agreement dated October 9, 1985 was reached between the parties and provided that Security Pacific would extend the outstanding Thunder note and loan additional money in exchange for promissory notes executed jointly and severally by OMP, Bailey, Brasell, and Cleveland. These notes consisted of a "renewal note" of $1,847,144, "operating note" of $90,000, "tax note" of $63,051.42, and a "deficiency note" of $436,398.55.[2] Security Pacific obtained a further security interest but agreed to forebear from foreclosing until such time as OMP defaulted on the renegotiated notes.

OMP defaulted on the notes after the settlement was executed. OMP failed to make numerous payments on the renewal note and violated the settlement agreement by failing to pay taxes and submit financial reports.

Security Pacific provided the requisite notice of foreclosure for sale of the property. On September 25, 1986, Security Pacific conducted the foreclosure sale and purchased the Inn for $1,000,000 and the adjacent property for $120,000 as the highest bidder. The court has previously upheld the validity of the foreclosure sale. At the time of foreclosure, $222,398.68 and $28,097.93 were owing Security Pacific in unpaid interest on the Renewal and Adjacent notes, respectively.

Given this procedural background, the only issues remaining are Security Pacific's claims for a deficiency judgment. The parties have stipulated that after the fore-

closure sale the indebtedness to Security Pacific was $1,233,164.49 on the Renewal note and $83,644.40 on the Adjacent note. The court will proceed to make findings of fact on Security Pacific's equitable conduct and the fair market value of the Inn before reaching conclusions of law regarding a deficiency judgment.

### B. Equitable Conduct

The court has received exhibits and heard testimony concerning the transactions involved and the conduct of the parties. Security Pacific first became involved with this property through loans to Thunder. Lasercraft, OMP, and the individual partners were involved in the motel property and accepted certain financial obligations. The debtors were unable to meet their obligations and the parties renegotiated. The parties entered a settlement agreement on October 9, 1985 in which Security Pacific agreed not to foreclose at that time and gave additional financing. Part of the agreement provided that the individual partners of OMP would become personally obligated on the notes. Bailey, Brasell, and Cleveland signed the Renewal note in their individual capacity as Bailey, Brasell, and McMillan had previously signed the Adjacent note in their individual capacity. The debtors' previous investment was protected and they continued operating the motel.

Evidence was presented that Security Pacific had knowledge of an affidavit that estimated the motel's value substantially below the amounts loaned and did not disclose this information to the debtors. Brasell also claimed that he was pressured into signing the settlement agreement and that he did not know that he would become personally obligated on the notes. Brasell's attorney was present during the closing and the negotiations had been ongoing for some time. The court notes that this particular conduct was related to reaching the settlement agreement. These actions were not inequitable so as to forfeit a

---

**2.** The tax note and deficiency note were made   on a non-recourse basis.

deficiency judgment as argued by the counterdefendants Brasell and Bailey.

Security Pacific's actions in foreclosing were more than fair. Security Pacific extended additional time for the debtors to cure defaults and provided an opportunity for the debtors to protect their investment in the Inn and profit from any successful operation. The debtors assumed a more active role in the motel's operations and substantial improvements were made, but the debtors were unable to meet their financial obligations. Security Pacific continued to deal fairly with the debtors but it became clear that the debtors could not successfully operate the motel and make debt payments.

The foreclosure sale was conducted in an equitable manner. Proper notice was given and other persons had the opportunity to bid for the property. The amount bid in by Security Pacific was substantially below the amount of indebtedness but there is no indication of improper conduct.

C. Fair Market Value of Property

In determining the fair market value of the Inn, the court made use of the income approach, comparable sales approach, and the cost approach. The income approach is the preferred appraisal method for income properties. The court will address the three methods for determining the fair market value of the Inn on September 25, 1986, the date of foreclosure. The adjacent vacant property will be evaluated separately.

The court has reviewed the five appraisals presented. The lender urges the court to accept the 1986 and 1988 appraisals of $750,000 to $1,000,000 prepared by Rip Walker and Leland Speakes, Jr. The debtors urge the court to accept the 1983, 1985, and 1988 appraisals of $3,450,000, $3,700,000 and $2,195,000, respectively, prepared by Jack Mann. The court finds the appraisal reports useful but does not accept the appraisals' conclusions.

The income approach requires the court to consider appraisals based on the net operating income capitalized at an acceptable rate of return. The court finds the following calculations helpful in determining the value of the Inn.[3] The court does not find that the estimated figures below are necessarily certain or unquestionable, but instead uses these figures merely as an aid in determining the property's fair market value for the relevant time period.

|  |  |
|---|---|
| Gross Potential Income | |
| 116 Rooms $ $34.50/room × 365 days | $1,460,730 |
| [L–$1,422,953, D–$1,423,500 –$1,545,410] | |
| Less: Vacancy and Credit Loss (55% of Gross) | 803,402 |
| [L–77%, D–40–45%] | |
| Gross Room Income | 657,328 |
| Plus: Restaurant and Other Income | 100,000 |
| [L–$22,100 (excluding restaurant), D–$458,500] | |
| Effective Gross Income | $ 757,328 |
| Less: Operating Expenses (65%) | 492,263 |
| [L88–70%, L86–65%, D88–65%, D85–60%] | |
| Net Operating Income | $ 265,065 |
| [L88–$122,126, L86–$150,310, D83–$530,276, D85–$523,056, D88–$422,969] | |
| Capitalization Rate [15%] | |
| 265,065 capitalized at 15% = $1,767,099 FMV–Income Approach | |

The court finds that gross potential income for the Inn is $1,460,730 at the average daily room rate of $34.50 for 116 available rooms. The court has considered the

3. The figures found to be useful by the court are in the column to the right. Where the court finds significant differences in the appraisals presented by the parties, the court has bracketed the range between the lender's (Walker appraisal indicated by "L") and debtors' (Mann appraisal indicated by "D") financial figures.

calculations of both parties using different room rates and numbers of rooms and finds that the above figure represents the potential income during the pertinent time period.

The amount of the vacancy and credit loss deduction is vigorously disputed. The occupancy rate (the reverse of the vacancy rate) has a substantial impact on gross room income and the bottom line. Both historical and projected figures were considered in the appraisals in determining the value of the Inn as of September 1986. After considering the appraisals before the court and hearing the testimony, the court is of the opinion that a reasonable occupancy rate for this hotel property is 45% and a reasonable vacancy rate is therefore 55%.

The parties have relied on wildly divergent occupancy rates in estimating the value of the property. The University Inn has had a troubled past which has resulted in a fluctuating occupancy rate. These variations are explained in part by changing ownership and inconsistent management. The Inn has not benefited from professional management and has developed a bad reputation according to the testimony presented. The proof at trial indicated that many of the problems which had contributed to these disappointing results in the recent past were being corrected. The court does not base its occupancy rate figure on future predictions which appear overly optimistic or historical occupancy rates which appear uncharacteristically low. However, the court cannot ignore the low actual rates or the improvements made during the relevant time period.

The court has reviewed all of the evidence in determining the difficult occupancy rate issue. The parties have presented testimony, appraisals, and other evidence to prove an indistinct and difficult issue of fact. The court is of the opinion that the debtors' projected occupancy rate of 55–60 percent was not borne out by the evidence. The court is of the further opinion that the lender's historical occupancy rate of 23 percent was unrepresentative of the Inn's overall performance, appeared unrealistically low, and unfairly diminished the Inn's value under the income approach.[4] The Inn's potential occupancy rate after renovation or other possible improvements does not justify the debtors' high estimate. By the same token, the lender's low figure failed to adequately take into account the Inn's changing condition. The Inn experienced an occupancy rate higher than the historical rate proposed by the lender for a significant period of time before the period in question and was apparently in the process of achieving an occupancy rate more in line with other Oxford hotels when the foreclosure process began.[5]

The occupancy rates at other similar Oxford hotels help the court put the Inn's occupancy rate in context. Walker testified that the Holiday Inn's occupancy rate was a stable 65 percent and that Best Western's occupancy rate was 50–55 percent. Walker based these figures on his investigation of competing motels and included these rates in the appraisal prepared for OMP. The appraisals prepared by Jack Mann indicated that the Holiday Inn's occupancy rate exceeded 75 percent and that the Best Western's occupancy rate was approximately 70 percent. The Holiday Inn is located downtown near the business community and the Best Western is on the

**4.** The court has reviewed the exhibits establishing the historical occupancy rates for the months between January 1986 and October 1988. These rates may be accurate but are not conclusive. The historical rates must be interpreted in light of the Inn's erratic performance during this troubled period. The court finds earlier occupancy rates relevant to the fair market value of the Inn as of September 1986 because they occurred during a normal time period. The court considers the Inn's entire histori-

cal performance in estimating the occupancy rate during the relevant time period.

**5.** The court notes that Security Pacific's occupancy rate estimates were far more optimistic when it was negotiating to refinance the property. The drastic changes in the performance of the Inn and the party's change in position regarding this issue indicate to the court that the historical rates are less than reliable in estimating the true value of the property at foreclosure.

outskirts of town within view of a major highway. The Inn has a competitive location on the outskirts of town near the University of Mississippi and a major highway. Of the approximately 513 motel rooms in Oxford, the Holiday Inn had 100 rooms and the Best Western had 100 rooms. The testimony presented indicates that the University Inn could realistically increase its occupancy rate but that such improvement would be limited to a degree because of an oversupply of rooms in Oxford. Regardless, the court looks to the value of the University Inn at the time of the foreclosure sale.

The court finds that an occupancy rate of 45 percent and a vacancy rate of 55 percent are reasonable figures in determining the value of this property pursuant to the income approach. This determination is based on all of the evidence presented at trial. The court has given due weight to all the conflicting proof which tends to establish the hotel's condition and value in September 1986 when the foreclosure occurred.

Other income available from related operations was also in dispute. The lender failed to include income from the restaurant and lounge operations because they were out of operation during part of this time period. The court will not ignore the restaurant operation simply because it was temporarily discontinued. Revenues from the restaurant and lounge improved under new management, but the restaurant income was not clearly established and was less significant to the bottom line than income from hotel operations. The other sources of income, including banquet room rental, telephone charges, and vending operations, were approximately $22,100.00. The court finds that $100,000 is an appropriate revenue figure. The court does not include in this figure the income from the ten rooms rented out on a monthly basis. The Inn has a total of 116 rooms and the court will not base its gross potential income estimate on 116 rooms and then recount ten rental rooms which are apparently rented out monthly. The court is of the opinion that double-counting these rooms would artificially inflate the income figure. Although the evidence on this point is somewhat unclear, the court excludes this income from its calculations because these rooms cannot realistically be available for both nightly and monthly rental.

Both parties estimated operating expenses in constructing their income statement. Although the amount of total expenses is very much in dispute, the expense ratios which were used in estimating total expenses are surprisingly similar. The court will give greater weight to the projected ratio of expenses to effective gross income, instead of the final expense estimates derived therefrom. The expense estimates diverge substantially only because the expense calculations are directly related to the effective gross income, and these figures differed substantially because of the dissimilar occupancy rates argued by the parties. The testimony at trial and appraisal reports indicated that an appropriate expense ratio is approximately 60 percent to 70 percent.[6] Based on all the evidence presented at trial, the court is of the opinion that expenses represented approximately 65 percent of effective gross income. The court will rely on the 65 percent expense ratio figure in finding $492,-263 as the appropriate expense estimate based on $757,328 in effective gross income.

The court finds that a 15 percent capitalization rate is appropriate for income property with the background and condition of the Inn.[7] The capitalization rate is determined by the rate of return expected by potential investors. The market demands a higher return for difficult investment properties. The court determines the fair market value under the income approach by dividing the net operating income by the

---

6. The appraisal reports utilized the following expense figures: L88–$264,353 (70%); L86–$279,146 (65%); D88–$823,346 (64% but indicated 65%); D85–$834,000 (60%) and D83–$834,000 (60%).

7. Walker relied on a 15% capitalization rate while Mann relied on rates of 13.5%, 14% and 15%. Mann testified at trial regarding a 15% rate.

capitalization rate. $265,065 divided by .15 equals $1,767,099.00. The court finds that the Inn's value was $1,767,099 in September 1986 under the income approach.

The Comparison Sales approach is not as useful in evaluating income property. This method is especially limited in the case *sub judice* because few close comparisons exist. Differences in location, time of sale, conditions of sale, terms of financing, and physical characteristics differentiate the foreclosure sale at issue from the comparative sales. The Oxford motel market is unique. Loose comparisons with properties in other cities are of limited assistance to the court in determining the Inn's value in September 1986.

The appraisals derived a gross rent multiplier (GRM) to enable a meaningful comparison. The GRM is the more reliable indicator. The lender's appraisal relied on a GRM of 2.0 and 2.4. The debtors' appraisal relied on a GRM of 2.3 and 2.5. The court finds that a GRM of 2.3 is appropriate and multiplies this figure by the $757,328 effective gross income previously calculated. The Inn's value is $1,741,854 under the comparative sales approach with a gross rent multiplier.

The court also considers the price per unit analysis but recognizes its inability to account for the dissimilarities between motel properties in an objective manner. The lender's appraisal considers $6,800 per unit appropriate and arrives at a $768,400 value. The debtor's appraisal considers $28,500 to $30,000 per unit appropriate and arrives at a value of $3,420,000 to $3,600,000.00. The court does not find this analysis persuasive given the tremendous variance in the price per unit of the "comparison" motel properties.

The cost approach is the least helpful to the court in determining the Inn's value. The replacement cost may serve as a cap on a properties value but does not indicate the fair market value of the property at the location after construction. The parties' estimates are relatively similar for most cost elements, except for depreciation. The lender would deduct a significant amount for economic obsolescence, because of external factors, in addition to physical depreciation on the property itself. The lender's deductions for economic obsolescence were based on the competitive motel market and limited demand in Oxford. The debtors deny that any adjustment should be made for economic obsolescence. The better cost approach estimates range from $865,000 to $3,450,000.00. Although the court does not rely on this approach in determining the Inn's value, the court finds that an analysis under the cost approach results in a value of approximately $2,000,-000.00.

Based upon the court's analysis of all three approaches, in light of the appraisals, exhibits, and testimony at trial, the court finds that the fair market value of the Inn on September 25, 1986 was $1,700,000.00. The court bases this valuation primarily on the income approach ($1,767,099), but has placed some reliance on the comparison sales approach ($1,741,854), and has given slight consideration to the cost approach ($2,000,000). The court has concentrated on the market value during the relevant time period, reviewed retroactive appraisals skeptically, and rejected speculation regarding major change and projections for the future. The court recognizes the subjective quality of such an assessment and has attempted to rely as much as possible on the objective elements and indicators in determining the value of the Inn.

The court has estimated various financial figures in arriving at value determinations under all three approaches, but these estimates are only an aid or tool to the court in reaching a fair market value determination. The court finds that the fair market value of the Inn was $1,700,000 based upon all of the evidence before the court.

The value of the adjacent piece of property is more readily ascertainable. The 6.5 acre tract of land was not in an improved condition but had a good location. Oxford has witnessed few vacant land transactions in recent years but comparisons between vacant land sales are more dependable than sales of improved properties. Vacant land sales involving large commercial tracts have ranged in price from $13,865 to $46,-

500 per acre in recent years. The most recent appraisals from both parties estimated the value of the land at $30,000 to $35,000 per acre. The court finds that the adjacent undeveloped land was worth $30,000 per acre in 1986. The court finds that the 6.5 acre tract had a fair market value of $195,000.00.

## II.

### CONCLUSIONS OF LAW

The court has previously awarded title to the University Inn and adjacent property to Security Pacific and upheld the validity of the foreclosure sale. Security Pacific seeks a deficiency judgment for the difference between the price it bid at the foreclosure sale and the amount of indebtedness. The debtors oppose any deficiency judgment on the grounds that inequitable conduct precludes a deficiency judgment and the fair market value of the Inn is in excess of the indebtedness.

A Mortgagee is entitled to a deficiency judgment from the debtor for the balance due on an indebtedness after the proceeds of the foreclosure sale are applied to the debt. Miss.Code Ann. Section 11–5–111; *Lake Hillsdale Estates, Inc. v. Galloway*, 473 So.2d 461, 466 (Miss.1985). The creditor who buys at his own trustee's foreclosure has one year to seek a deficiency judgment. Miss.Code Ann. Section 15–1–23; *Rankin County Bank v. McKinion*, 531 So.2d 822, 824 (Miss.1988). Security Pacific sought a deficiency judgment in a proper fashion.

However, the mortgagee may be precluded from a deficiency judgment if its actions were inequitable. *Lake Hillsdale*, 473 So.2d at 466; *Mississippi Valley Title Ins. v. Horne Const. Co.*, 372 So.2d 1270, 1273–74 (Miss.1979). Although Mississippi has failed to provide statutory safeguards for mortgagors subject to deficiency judgments, the mortgagee's right to a deficiency decree is not absolute. *Lake Hillsdale*, 473 So.2d at 466. The mortgagee must establish that it is entitled to a deficiency

judgment under the principles of equity. The primary focus is the sales price at foreclosure and circumstances surrounding foreclosure. *Lake Hillsdale*, 473 So.2d at 466.

Security Pacific's bid at foreclosure was $1,000,000 for the Inn and $120,000 for the adjacent land. This amount was far below the amount of indebtedness, but the bid price was not so grossly inadequate as to shock the conscience of the court or establish inequitable conduct. The court has not found inequitable conduct which would completely bar this equitable remedy.[8] Security Pacific has demonstrated its equitable entitlement to a partial deficiency judgment during the foreclosure process. The court has previously ruled that the foreclosure was conducted properly. Security Pacific was patient prior to foreclosure and attempted to work with the debtors. The court does not find inequitable conduct on the part of Security Pacific sufficient to completely bar a deficiency judgment. Although the October 1985 settlement agreement may appear unfair to OMP's individual partners in retrospect and Security Pacific's negotiations may appear harsh, Security Pacific did not violate any duty. Security Pacific allowed these businessmen another opportunity to make a success of the motel and save their investment. The proof established that Security Pacific dealt to a much greater extent with Mr. Bailey than with Mr. Brasell or Mr. Cleveland in subject negotiations. It appears to the court that Mr. Bailey probably did not fully disclose all features of the negotiations to his partners. Regardless, Security Pacific acted equitably in its dealings and is entitled to a deficiency judgment.

The court will fashion an appropriate remedy under the equitable powers of the court. *Mississippi Valley*, 372 So.2d at 1273–74. The court is of the opinion that the proper measure of damages is the difference between the fair market value of the property as of the time of foreclosure and the value of encumbrances against the

---

**8.** Security Pacific was the highest bidder at the foreclosure sale but bid substantially below the fair market value. The court can remedy this far too common situation by allowing a deficiency judgment based on the fair market value of the property instead of the bid price.

property at that time. *See Lake Hillsdale,* 473 So.2d at 466; *Central Financial Services v. Spears,* 425 So.2d 403, 405 (Miss. 1983).[9] The mortgagee must show that the value of the property obtained at foreclosure is insufficient to satisfy the indebtedness. *Rankin County Bank v. McKinion,* 531 So.2d at 825. The court has found the price paid at the foreclosure sale inadequate and will award a deficiency judgment only for the difference between the fair market value of the property and the indebtedness.

A deficiency judgment is typically based on the bid price at the foreclosure sale. The court recognizes that Mississippi courts have not expressly stated that they have the equitable power to award a deficiency judgment based on the fair market value instead of the bid price at the foreclosure sale. However, the Mississippi Supreme Court has clearly given broad equitable protection to mortgagors. *See, e.g., Lake Hillsdale,* 473 So.2d at 466. Mississippi courts recognize an equitable limitation on deficiency judgment awards.

> The mortgagee's right to a deficiency decree usually depends on the facts and circumstances of each case.... While it has been held that the power to render a deficiency decree is governed by the rules which would apply at law, it has also been held that the court has jurisdiction after a foreclosure sale to determine any intervening fact which would make it *inequitable* to enter a deficiency decree. Accordingly, no right to a deficiency judgment vests until plaintiff satisfies equity that it would be equitable, *in light of the sale price,* to authorize a deficiency judgment. (Emphasis added).

*Lake Hillsdale,* 473 So.2d at 466 (quoting *Mississippi Valley,* 372 So.2d at 1272). The relationship between the bid price at the foreclosure sale and the fair market value of the property is not only one of the keys in evaluating "equitable conduct", it also may establish the amount that should be awarded in accordance with equity under the power of a Mississippi chancellor.

In *Mississippi Valley,* the Supreme Court affirmed the chancellor's complete denial of a deficiency judgment award where it was not "equitable", even though the bid at the foreclosure sale was not found to be "unconscionably low." *Mississippi Valley,* 372 So.2d at 1272. The Supreme Court concluded that deficiency judgment cases "are decided on a case by case basis under equitable principles" and upheld the complete denial of the deficiency judgment sought. *Mississippi Valley,* 372 So.2d at 1274. Instead of denying a deficiency judgment award entirely, the court finds it equitable to award an adjusted deficiency judgment based upon a more accurate determination of the Inn's fair market value. Some inequitable conduct did occur.[10] However, the complete denial of a deficiency judgment award would not be in accordance with equity, just as the grant of a deficiency judgment award based on the clearly inadequate bid price would not be in accordance with equity.

The parties stipulated to the amount of indebtedness remaining on September 25, 1986, after application of the price bid at the foreclosure sale. Counterdefendants Bailey, Brasell and Cleveland were each personally obligated on the Renewal note and were indebted after the foreclosure in

**9.** The court's role in a diversity case is to ascertain what the Mississippi Supreme Court would hold in a similar case. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The court's duty is to view itself as an inferior court and to make a decision that it thinks a state court would reach. *Jackson v. Johns-Manville Sales Corp.,* 781 F.2d 394, 396–97 (5th Cir. 1986); *DiPascal v. New York Life Ins. Co.,* 749 F.2d 255, 260 (5th Cir.1985). The court's interpretation of Mississippi law regarding this issue is consistent with the language of the Mississippi cases cited and a logical application of these decisions. The court recognizes that it is in the position of a chancellor in Mississippi's court system and is required to reach its decision based on equitable principles.

**10.** The court notes that the mortgagee had reason to believe that the Inn was greatly overvalued during settlement negotiations, but withheld this information from the debtors and created the misimpression that the Inn was worth far more than what the mortgagee was later willing to bid at the foreclosure sale. This questionable conduct, as well as other actions shown at trial, is sufficient to reduce, but not eliminate, a deficiency judgment award under the principles of equity in Mississippi.

the amount of $1,233,164.49. Counterdefendants Bailey, Brasell and McMillan were separately obligated on the $175,000 Adjacent note and remained indebted in the amount of $83,664.40 after the foreclosure sale.[11]

The court reduces the amount of indebtedness which the counterdefendants are responsible for by the difference between the bid price and fair market value. The bid price on the motel was $700,000 below fair market value and the bid price on the adjacent tract was $75,000 below fair market value. Using the *equitable arm* of Mississippi courts, the court finds that the indebtedness of Bailey, Brasell, and Cleveland should be reduced from $1,233,164.49 to $533,164.49 on the Renewal note and the indebtedness of Bailey, Brasell and McMillan should be reduced from $83,644.40 to $8,644.40 on the Adjacent note. Accordingly, counterplaintiff Security Pacific shall recover a total deficiency judgment in the amount of $541,808.89.[12]

In a diversity action, state law governs the award of interest. *Stovall v. Illinois Central Gulf R. Co.*, 722 F.2d 190, 192 (5th Cir.1984); *Budge v. Post*, 643 F.2d 372, 375 (5th Cir.1981). In Mississippi the amount of interest after default is controlled by the terms of the contract evidencing the debt. *See* Miss.Code Ann. Section 75–17–7. The promissory notes state that interest will be calculated at the "variable rate" as defined in the contract. Prejudgment interest will be awarded at the "variable rate" between September 25, 1986, the date of foreclosure, and the date of judgment. *Watson v. Callon Petroleum Co.*, 632 F.2d 646, 648, 649 (5th Cir.1980). The court will also award postjudgment interest at the same "variable rate" or the federal statutory rate. The loan agreements also provide for attorneys' fees and expenses.

The court finds that Security Pacific is entitled to prejudgment interest, postjudgment interest, attorneys' fees, and expenses in an amount yet to be determined.

The court suggests that the parties agree to a stipulation as to the amount of prejudgment interest, postjudgment interest, attorneys' fees and expenses.[13] In the event the parties are unable to stipulate as to the amount of these awards, the parties are directed to submit a brief with necessary calculations and affidavits to address (1) the amount of prejudgment interest based on the deficiency judgment amount set by the court at the contracted "variable rate"; (2) the amount of postjudgment interest at the appropriate rate; and (3) the amount of attorneys' fees and expenses which are appropriate under Mississippi law.[14]

An order in accordance with this opinion will be issued.

---

11. Although certain promissory notes were made on a non-recourse basis or on behalf of their corporation, Bailey, Brasell and Cleveland became personally liable on the $1,847,144 Renewal note. *See* exhibit CP–17. Bailey, Brasell, and McMillan were personally liable on the $175,000 Adjacent note. *See* Exhibit CP–23. A default judgment was entered against Robert F. McMillan on March 5, 1987.

12. The parties only stipulated to the amount owing after the foreclosure sale. The court has determined the fair market value and the amount underbid. $1,233,164.49 − 700,000 = $533,164.49. $83,644.40 − 75,000 = $8,644.40. $533,164.49 + 8,644.40 = $541,808.89.

13. The parties have done a good job of stipulating to the prime interest rates applicable, the amount the loan payments were in default, and the remaining indebtedness.

14. The parties should address the amount of attorneys' fees appropriate under state law and discuss the factors which guide the court's discretion. *See, e.g., Gulf Union Industries, Inc. v. Formation Security, Inc.*, 842 F.2d 762, 767 (5th Cir.1988); *Clark v. Whiten*, 508 So.2d 1105, 1108 (Miss.1987); *McKee v. McKee*, 418 So.2d 764, 767 (Miss.1982); *Gilchrist Tractor Co. v. Stribling*, 192 So.2d 409, 418 (Miss.1966). The parties should address relevant federal considerations in determining the attorneys' fee amount and structure the issues in accordance with the federal three-step method of awarding attorneys' fees. *See, e.g., Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087, 1092 (5th Cir.1982). The parties should further address the type interest rate which the court should apply, the proper interest calculations, and the requested interest award.